[No. 30263. Department Two. December 18, 1947.]

THE STATE OF WASHINGTON, *Respondent*, v. JAMES MITCHELL, *Appellant.*[1]

*Anthony M. Ursich* and *Richard R. Hodge,* for appellant.

*Patrick M. Steele, Earl D. Mann,* and *John B. Krilich,* for respondent.

[1]Reported in 188 P. (2d) 88.

STEINERT, J.—Defendant, James Mitchell, was charged with the crime of murder in the first degree. The information, filed by the prosecuting attorney for Pierce county, alleged:

"That the said James Mitchell in the County of Pierce, in the State of Washington, on or about the 18th day of December Nineteen Hundred and forty-six did then and there being unlawfully and feloniously with a premeditated design to effect the death of John R. Thompson, a human being, kill and murder the said John R. Thompson by shooting him with a pistol loaded with powder and ball thereby mortally wounding the said John R. Thompson all while engaged in the commission or in attempting to commit the crime of robbery upon the person of the said John R. Thompson, such act being *emi*nently dangerous to another, to-wit: *emi*nently dangerous to the said John R. Thompson and evincing on the part of the said James Mitchell a depraved mind, regardless of human life, from which mortal wounds the said John R. Thompson did on the 18th day of December, 1946, die."

Defendant entered a plea of not guilty and, later, an additional plea of insanity or mental irresponsibility existing at the time of the commission of the crime charged and continuing to exist thereafter.

The jury before which the defendant was tried returned a verdict of guilty of murder in the first degree and, by answer to a special interrogatory, declared that the death penalty should be imposed. After denying defendant's motion for a new trial and motion for an order staying judgment and further proceedings, the court entered judgment sentencing him to be hanged. Defendant appealed.

The evidence in the case, in so far as it is undisputed, may be summarized as follows:· Appellant, James Mitchell, a negro, was at the time of the homicide, December 18, 1946, twenty years of age. He was born and reared in Texas and migrated to the state of Washington in 1944. For the greater part of the year 1946, he was employed as a laborer at the naval supply depot and at a shipyard plant in or near Tacoma. After the middle of November of that year, he was out of employment.

On December 18, 1946, the following events occurred: About noon, appellant went to a cafe and beer tavern located near Fifteenth street and Broadway, in Tacoma, and while there purchased from, or through, the proprietor, a .38 caliber Smith & Wesson revolver, loaded with six cartridges. Shortly after one o'clock p. m., he went to an office building situated near Eleventh and Broadway, mounted the stairs, and entered the office of Dr. John R. Thompson, a physician. Dr. Thompson was not in at the time, and appellant, after waiting for a while, left the office. He returned sometime between two-thirty and three o'clock p. m., and at that time the doctor was in. At the latter's invitation, appellant entered the doctor's private office and treatment room, and almost immediately thereafter drew his revolver and shot Dr. Thompson twice, once through the head and once through the abdomen, from which wounds death ensued almost instantly. Before leaving the scene of the crime, appellant took from the doctor's person a watch, a charm, a chain, and a diamond ring. He then made his escape without attracting anyone's attention.

About a week later, appellant was arrested on his approach to a service station, and in his possession were found the missing ring, charm, and chain, and also the gun from which the lethal bullets had been fired. Sometime thereafter, the police authorities located and recovered the watch, which appellant had in the meantime sold to a third party.

Questioned by the authorities, appellant at first denied all connection with the crime and otherwise explained his possession of the missing articles. Upon a second questioning, however, he made a complete confession, admitting that he had shot Dr. Thompson and then taken from his person the jewelry above described.

Further evidence, introduced on behalf of appellant, was to the following effect: He was born out of wedlock, when his mother was but fifteen years of age, and was raised by his maternal grandparents. His mother left home when he was about a year old and thereafter saw him very infre-

quently, until he joined her in Tacoma in 1944. His father was addicted to "fits"; his maternal uncle was insane; and his paternal grandmother had some sort of mental affliction. Appellant himself sustained a head injury in his early youth and for some years thereafter periodically suffered fainting spells and "fits." He received only four and a half years of schooling, quitting school when thirteen years old, while in the fifth grade. In 1942, he was inducted into the United States navy, but in about two months, after spending a considerable part of that time in a psychiatric ward, he was given a medical discharge. During the summer and fall of 1946, while he was employed in Tacoma, those who associated with him noticed a distinct change in his personality and demeanor. He became sullen, morose, irritable, and very untidy. Sometimes he would not eat regularly, and often he was observed staring into space or talking aloud to himself.

When questioned by the police officers shortly after his arrest, appellant told them that he had not known Dr. Thompson nor had been in his office prior to the day of the homicide; that he had not gone into that particular office with any design, but purely by chance; that he had no purpose in mind when he went there, nor any intent either to kill or to rob the doctor, nor any reason for committing either of such crimes. However, there is undisputed evidence in the record that during the month of February, 1946, appellant had visited Dr. Thompson at his office and at that time procured from him a health certificate for use in obtaining employment at the naval base.

Appellant testified in his own behalf and, in support of his plea of insanity, narrated a grimly tragical story. He stated that from the time he was thirteen years old he had heard the voice of God; that God would tell him to do certain things and he would do them; that in his early life God often told him "to knock kids in the head" and he would obey the command; and that in later years he frequently conversed with God. He further stated that on December 18, 1946, God talked with him and directed him to

the building and office occupied by Dr. Thompson; that after waiting in the outer office a while "the voice" directed him to take a walk, which he did; that after some further time the same voice directed him to return to the office; that upon his return, the doctor invited him into the inner office; that God then and there told him "to shoot," and he obeyed the command. Appellant further testified that he did not believe he had done wrong, because God had directed him to do it, and that he would do so again if so directed. In response to questions on direct examination, he testified that under similar circumstances he would shoot his own attorney or any member of the jury.

Three physicians, specializing in psychiatry, testified that, in their opinion, appellant was insane, both at the time of the homicide and at the time of the trial. Two other physicians, one of whom was a psychiatrist, testified that in their opinion appellant was at all times sane and that his defense was fabricated. The court instructed the jury on the law of insanity, and submitted to it special verdicts to be returned in the event the jury found appellant to have been insane at the time of the homicide or at the time of the trial. No exception was taken to any of those instructions. As previously stated, the jury returned a verdict of guilty of murder in the first degree and, by special answer, prescribed the imposition of the death penalty.

Throughout this opinion will appear the terms "imminently dangerous" and "eminently dangerous." We shall use these phrases, respectively, as they are used in the particular statutes or other writings to which we may at the time be referring, although, apparently, both expressions are intended to have the same meaning.

The principal questions raised by the assignments of error are whether appellant was properly charged with the crime of murder in the first degree, as defined by statute, and whether, under the evidence, the jury was properly instructed on the law relating to such crime.

The relevant statute is Rem. Rev. Stat., § 2392 [P.P.C. § 117-5], which, so far as is material here, reads as follows:

"The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either—

"1. With a premeditated design to effect the death of the person killed, or of another; or,

"2. *By an act imminently dangerous to others and evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual; or,*

"3. Without design to effect death, by a person engaged in the commission of, or in an attempt to commit, or in withdrawing from the scene of, a robbery, rape, burglary, larceny or arson in the first degree; . . ." (Italics ours.)

It is asserted by the appellant, and by the respondent state as well, that the information charged the appellant with the crime of murder in the first degree, under each of the subdivisions of the statute as above quoted, that is, that appellant killed John R. Thompson (1) with a premeditated design to effect Thompson's death; (2) by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, but without a premeditated design to effect the death of any individual; and (3) without design to effect death, but while engaged in the commission of, or in the attempt to commit, the crime of robbery upon the person of John R. Thompson. For the purposes of this case, we will assume that the parties are technically correct in these assertions, although it could well be argued that the information intended to charge, and did charge, that the act of killing, however perpetrated, was with a premeditated design to effect the death of John R. Thompson.

By a series of instructions, however, the trial court definitely and positively advised the jury that appellant could be found guilty of murder in the first degree if, at the time and place in question, appellant killed John R. Thompson and if the killing was done by appellant,

"(c) while engaged in an act imminently dangerous to the said John R. Thompson and evincing a depraved mind regardless of human life, and without a premeditated design to effect the death of the said John R. Thompson."

Appellant contends that the court erred (a) in denying his motion, made after the submission of the state's case and

renewed at the conclusion of all the evidence, to strike from the information the charge that appellant committed the crime of murder in the first degree by an act "imminently dangerous to another, to-wit: imminently dangerous to the said John R. Thompson and evincing on the part of the said James Mitchell a depraved mind, regardless of human life"; (b) in instructing the jury with reference to the commission of the crime of murder in the first degree by an act imminently dangerous to others, evincing a depraved mind, regardless of human life, but without a premeditated design to effect the death of any individual; and (c) in permitting the prosecuting attorney to argue to the jury that appellant had committed the crime in the manner described in the preceding clause (b). These respective contentions are made upon the ground that there was no evidence to support such charge or to warrant such instructions.

The question presented by these assignments is this: Where the act of killing a human being was specifically aimed at and inflicted upon that particular person and none other, can the perpetrator of the act be convicted of the crime of murder in the first degree under subd. 2 of Rem. Rev. Stat., § 2392, on the theory that the act was imminently dangerous to *others*, evincing a depraved mind, regardless of human life, but without a premeditated design to effect the death of any particular individual?

Appellant asserts the negative of this proposition, respondent the affirmative.

The question is one of first impression in this jurisdiction, and we therefore look to the cases decided elsewhere. The first, and most often cited, case on the subject is that of *Darry v. People,* decided by the court of appeals of New York in 1854 and reported in 10 New York Reports at p. 120. The report covers forty-three pages and contains three opinions arriving at the same result; three other judges concurred with the writers of the opinions, and two judges dissented.

In that case, the indictment accused one Darry of killing his wife by beating her with his fists and with a chair and

by kicking her. The indictment contained five counts: The first two charged the murder to have been committed with malice aforethought, according to the common-law form; the others alleged that it was done with a premeditated design to effect the death of the deceased. The trial judge instructed the jury that it was not necessary that the accused, at the time of inflicting the injuries, entertained a premeditated design to effect the death of the deceased, but that if the injuries were inflicted by the accused and perpetrated by him by such acts as were imminently dangerous to the life of the deceased and evincing on the part of the accused a depraved mind, regardless of human life, although without any premeditated design to effect the death of his wife, the offense would come within the statute defining murder. The accused was convicted of murder and was sentenced to death.

The New York statute existing at that time (2 R.S. 657) provided:

"§ 4. The killing of a human being, without the authority of law, by poison, shooting, stabbing, or any other means, or in any other manner, is either murder, manslaughter, or excusable or justifiable homicide, according to the facts and circumstances of each case.

"§ 5. Such killing, unless it be manslaughter or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases:

"1. When perpetrated from a premeditated design to effect the death of the person killed, or of any human being:

"2. When perpetrated by any act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual:

"3. When perpetrated without any design to effect death, by a person engaged in the commission of any felony."

The penalty for the crime of murder was death.

Our statute, Rem. Rev. Stat., § 2392, as previously quoted, is patterned upon and almost identical with § 5 of the New York statute.

The New York court, speaking through Selden, J., held that the second subdivision of § 5 of the statute, correspond-

ing to the second subdivision of Rem. Rev. Stat., § 2392, embraced only those cases where the act resulting in death was such as to imperil the lives of many persons, without being aimed at any one in particular; and therefore did not include a case of killing without premeditated design to effect death, though perpetrated by such acts as were imminently dangerous to the person killed, and though evincing a depraved mind, regardless of the life of the deceased. After tracing the history of the statute into the early common law respecting murder, under which were included not only cases of particular malice, but also of general or universal malice, manifesting a depraved and reckless conduct, aimed at no one in particular, but endangering indiscriminately the lives of many, and resulting in the death of one or more, Judge Selden said, with reference to the second subdivision of the statute:

"For these reasons I am entirely satisfied that this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of many persons in jeopardy without being aimed at any one in particular, and are perpetrated with a full consciousness of the probable consequences. Such acts may well be said to evince that reckless disregard of and indifference to human life, which is fully equivalent to a direct design to destroy it. The moral sense of mankind distinguishes between acts of this sweeping and widely dangerous character and ordinary cases of individual homicide, and so in my judgment does the statute."

As an additional argument in support of his conclusion, Judge Selden wrote:

"But there is an additional reason for putting this construction upon the subdivision in question. If it can be so construed as to include the case at bar, and others of a similar description, we are left wholly without any line of distinction between murder and manslaughter, except the loose and uncertain opinion of a jury as to whether the act which produced death did or did not evince a 'depraved mind, regardless of human life.' There is scarcely a case of manslaughter which upon this construction may not be brought within the definition of murder, and punished as such, provided a jury can be found to say that the act which produced death evinced a 'depraved mind, regardless of

human life;' because the other clause, to wit, 'imminently dangerous to others,' if it can apply to this would apply to every case of homicide, as the result would always prove the imminently dangerous nature of the act; and because upon this construction cases of homicide committed unintentionally, in the heat of passion, would not be excluded, as such a case might very well evince a depraved mind, regardless of human life, in the opinion of a jury. This construction then would throw us upon that sea of uncertainty which it was the special object of the revisors in framing, and of the legislature in adopting the section in question, to avoid."

Judge Denio, author of the second opinion, likewise discussed the history and purposes of the statute, and came to the same conclusion, but from a slightly different viewpoint, stressing the thought that the second subdivision of the statute was not intended by the legislature to apply to a case of homicide resulting from a direct assault by one person upon another. Discussing the particular section of the statute in question, he said:

"The act must evince a depraved mind, *regardless of human life*. These words are exactly descriptive of general malice, and cannot be fairly applied to any affection of the mind having for its object a particular individual. They define general recklessness, and are not pertinent to describe cruelty to an individual. The act by which the death is effected must *evince* a disregard to human life. Now, a brutal assault upon an individual may evince animosity and hate towards that person, and a cruel and revengeful disposition, but it could not properly be said to be evidence of a recklessness and disregard of human life generally. . . . Again, the killing must be without any premeditated design to effect the death of any *particular* individual. Why did not the legislature say, *of the person killed*? or, if it were intended to embrace both general and particular malice, *of the person killed, or of any particular individual*? The first subdivision presented an example, in immediate proximity, of the phraseology suggested, where it was intended to provide as well for the case of particular malice effecting its object as for malice taking effect in a manner collateral to the intention. Upon the most careful and anxious examination of the provision, I am entirely satisfied that it cannot, without violence to the intention of the legislature as evinced by the language, be applied to the case

of homicide resulting from a direct assault by one person upon another."

In the case of *Mitchell v. State,* 60 Ala. 26, the prisoner was indicted for the murder of a person by striking him with a piece of wood or with some deadly weapon. The statute of Alabama divided the crime of murder in the first degree into four classes, of which the fourth was the same as that encompassed within the second subdivision of Rem. Rev. Stat., § 2392, and the second subdivision of § 5 of the New York statute, 2 R. S. 657. The trial court in that case charged the jury that if the homicide was perpetrated by an act greatly dangerous to the life of the deceased, and evidenced a depraved mind regardless of human life, it would be murder in the first degree. Holding that the instruction constituted error, the supreme court reversed the judgment of conviction. The substance of the court's opinion on the question there under consideration is clearly and accurately stated in the second paragraph of the syllabus, which we quote:

"A homicide, 'perpetrated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life, although without any preconceived purpose to deprive any particular person of life,' is, by the terms of the statute, murder in the first degree. This provision of the statute applies to homicides committed from 'universal malice,' as it is called in the books; as by purposely discharging a loaded gun into a crowd of people, or wrecking a passenger train on a railroad, whereby one or more persons are killed; but, *ex vi terminorum,* it excludes a homicide which is committed by a blow or injury intentionally aimed at and inflicted on the person killed, though such homicide may be murder in the first degree under another clause of the statute. Hence, where the homicide was committed by a blow with an oaken stick, intentionally aimed at the deceased, it is error to instruct the jury, 'that if the homicide was perpetrated by an act greatly dangerous to the life of the deceased, and evidenced a depraved mind regardless of human life, it would be murder in the first degree.' "

In *Johnson v. State,* 24 Fla. 162, 4 So. 535, the accused was convicted of murder in the second degree. The evidence was

that Johnson, the accused, in answer to a woman's call for protection against the assault of her husband, shot and killed the husband. The statute of Florida contained a section providing that the killing of a human being, when perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree.

The supreme court of Florida reversed the judgment of conviction, holding that, under the evidence, the accused could not be convicted of murder in the second degree, as above defined, since the act of shooting was directed against a particular individual. The *Darry* case, *supra,* was cited as sustaining authority.

In *Golding v. State,* 26 Fla. 530, 8 So. 311, the syllabus by the court reads:

"The defendant and G. became engaged in a personal difficulty in which G. was killed by the defendant, but the evidence failing to show that the killing was perpetrated by an act imminently dangerous to others, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual: *Held,* not to be murder in the second degree [as defined by statute]."

In *State v. Reddington,* 7 S. D. 368, 64 N. W. 170, the defendant was convicted of the crime of murder in the first degree. The penal code of South Dakota defined murder in the first degree in virtually the same language as that contained in Rem. Rev. Stat., § 2392, quoted above. The judgment of conviction was reversed because of an erroneous instruction. We quote from the syllabus as prepared by the court:

"Where an indictment for murder contains but one count, and that charges the crime to have been committed with a premeditated design to effect the death of the person killed, as in subdivision 1 of section 6442, Comp. Laws, it is reversible error to instruct the jury that the premeditated design need not be proved, but that the jury may convict if they find that the act of the defendant resulting in the death

of the deceased was an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, as in subdivision 2 of said section, although without any premeditated design to effect the death of any particular individual."

The same question was before the Oklahoma supreme court in the case of *Jewell v. Territory*, 4 Okla. 53, 43 Pac. 1075. Section 2078, Statutes of Oklahoma, 1893, defining murder, was practically the same as Rem. Rev. Stat., § 2392. Referring to the second subdivision of the Oklahoma statute, corresponding to the second subdivision of our statute, the court said:

"The class of cases intended to be covered by this subdivision is where the acts by which the homicide is perpetrated are directed against no particular person, but against a number of persons generally, or where the act is imminently dangerous to a number of persons, but directed against none. As where one rides a vicious horse into a crowd of persons with no intent to injure any person, but with a reckless disregard of human life; or, where one throws a heavy stone into a crowded street, or blows up a building with dynamite, knowing there are persons in the building, but with no design to kill any one, but only with an intent to destroy the building. There are other cases that come within this class, but we use these as illustrations. And the statute has no application to a case where the act causing death is directed against some particular person, for then, if it is done with design to effect death, it comes within the class embraced in the first subdivision; or, if there is no premeditated design to effect death, then, it is either one of the degrees of manslaughter, or justifiable, or excusable homicide."

The judgment of conviction was reversed.

In *State v. Lowe*, 66 Minn. 296, 68 N. W. 1094, the defendant was convicted of the crime of murder in the third degree, under a statute (§ 6440, Gen. St. 1894) which provided that the killing of a human being when perpetrated by an act "eminently dangerous" to others, and evincing a depraved mind, regardless of human life, although without a premeditated design to effect the death of any individual, is murder in the third degree. Reversing the judgment of conviction, the supreme court of Minnesota said:

"We are of the opinion that the facts attempted to be set out in this indictment would not, even if properly set out, constitute a charge of murder in the third degree. The portion of section 6440 above quoted was intended to cover cases where the reckless, mischievous, or wanton acts of the accused were committed without special regard to their effect on any particular person or persons, but were committed with a reckless disregard of whether they injured one person or another.

"A very full discussion of the meaning of this portion of this section may be found in the opinions of Selden, Denio, and Parker, JJ., in *Darry v. People,* 10 N. Y. 120. But in one respect we do not agree with the reasoning in that case. It is there held that, in order to bring the case within this statutory provision, the reckless act of the accused must jeopardize the lives or safety of more than one person. We do not deem it necessary that more than one person was or might have been put in jeopardy by such act. G. S. 1894, § 6842, subd. 10, provides, 'The singular number includes the plural, and the plural the singular.' It is, however, necessary that the act was committed without special design upon the particular person or persons with whose murder the accused is charged. The acts and omissions here in question are not of that character. They had special reference to Clara Bergh [the deceased]."

The same question has been similarly decided in Colorado. In *Longinotti v. People,* 46 Colo. 173, 102 Pac. 165, judgment of conviction of murder in the first degree was reversed because of a statement of the district attorney to the jury to the effect that aiming a gun and firing it at the deceased was greatly dangerous to the deceased, taking his life, being an act greatly dangerous to the lives of others, indicating a depraved mind, regardless of human life, and therefore constituting murder in the first degree.

After analyzing many cases on the subject, the court said:

"From these authorities, it seems that murder, as defined by the fourth clause of our statute, is such as is committed by an act greatly dangerous to the lives of persons other than the one killed, and showing a reckless disregard of human life; and it therefore does not include a case such as we have before us, where the killing results from the intentional shooting of the individual slain, and there is no element of what is termed universal malice shown. We

should have so held without the aid of the authorities cited, for the language of our statute permits no other construction, and it is, in effect, the language of the common law, from which our statute is taken."

In *State v. Russell*, 106 Utah 116, 145 P. (2d) 1003, where the defendant was charged with murdering his wife, the trial court submitted the question of murder in the first degree under that division of the statute which provided:

"Every murder perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life, is murder in the first degree."

The supreme court of Utah reversed a judgment of conviction on the ground, among others, that there was no evidence from which the jury could find the defendant guilty of murder in the first degree under the division quoted above. The court said:

"Division 4 requires the doing of an 'act greatly dangerous to the *lives of others* and evidencing a depraved mind, regardless of human life.' This requires an act which is, at least potentially, dangerous to other persons and not directed against any one in particular. Such an act is more dastardly than where only one person can be endangered, even though only one is affected thereby. No doubt this was considered in making this murder in the first degree without a specific intention to kill. This division is distinguished from divisions 1 and 3 which require a specific intention to kill a particular person, whereas here, no intention to kill is required, though an intention to kill persons generally may exist, but the act which is greatly dangerous to the lives of others must be directed against people generally and indiscriminately and not against any particular person. In *Darry v. People*, 10 N. Y. 120, on page 147, the court in construing a similar provision [see McKinney's Consol. Laws of N. Y. c. 40, Penal Law, Ann. § 1044, subdiv. 2] said:

" '. . . this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of *many* persons in jeopardy without being aimed at any one in particular.'

"[Citing other cases.] Here the evidence is positive and undisputed that the defendant's acts were directed toward and endangered only the life of the deceased and not against

people generally and indiscriminately. The court erred in submitting that question to the jury."

The cases thus far considered all support appellant's contention. The state has cited but two cases directly in point, which hold to the contrary: *Hogan v. State,* 36 Wis. 226, and *Radej v. State,* 152 Wis. 503, 140 N. W. 21.

The *Hogan* case, *supra,* was decided in 1874, twenty years after the decision in the *Darry* case, *supra.* The opinion is quite long and involved, and we will not endeavor to analyze it in detail. The accused was convicted of murder in the second degree for killing his brother in an altercation between them with reference to the division of certain land. On appeal, his counsel contended, *inter alia,* that the evidence clearly established the fact that the fatal blow was directed solely against the deceased, and that therefore the act was either murder in the first degree or manslaughter. In its opinion, the court discussed the *Darry* case, *supra,* at length, but declined to follow it. On the contrary, the court held that, in the statutory definition of murder in the second degree, the words "any act imminently dangerous to others" must be held to mean any act imminently dangerous *to any person or persons other than the person committing the act.*

In the *Radej* case, *supra,* the accused was convicted of murder in the second degree for having killed one Rolland by drawing a revolver, pointing it at the head of Rolland, and instantly discharging it. Upholding the conviction, the supreme court of Wisconsin said:

"Surely, for a person to point a loaded revolver at a vital part of another's body and discharge it, is to perpetrate an act imminently dangerous to others, and if done without excuse or justification and not in the heat of passion characterizing some lower degree of homicidal offense than murder in the second degree, evinces 'a depraved mind, regardless of human life.' Common sense teaches that. One would not think of searching for authority to establish it as a principle or illustrate it by adjudications, and would reject any to the contrary, if found, as unworthy of attention. Therefore we may well pass that feature of the case without further notice."

The state cites several other cases in support of its contention, but none of them is, in our opinion, sufficiently in point to merit further attention.

■ After careful consideration of Rem. Rev. Stat., § 2392, in the light of the authorities bearing on the question here under consideration, we believe that the weight of authority and the better reasoning support the conclusion at which we have arrived, namely, that where the act causing a person's death was specifically aimed at and inflicted upon that particular person and none other, the perpetrator of the act cannot properly be convicted of murder in the first degree under subdivision 2 of Rem. Rev. Stat., § 2392, on the theory that the act was imminently dangerous to others, evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual.

This, of course, does not mean that, under the evidence in this case, the accused could not properly have been convicted of the offense under the other provisions of the statute. It may be that the jury based its verdict on either subd. 1 or subd. 3 of the statute, but we cannot say, as a matter of law, that it did so.

Since, upon the evidence, appellant could not properly have been convicted under subd. 2 of Rem. Rev. Stat., § 2392, the charge under that subdivision should have been withdrawn. For the same reason, we consider the submission of the case on that charge and the giving of instructions on that issue prejudicially erroneous, in that the jury was thereby authorized to return a verdict of guilty upon a charge not properly in the case.

The judgment is reversed, with direction to the court to grant a new trial.

MALLERY, C. J., BEALS, ROBINSON, and JEFFERS, JJ., concur.