[No. 46189. En Banc. August 21, 1980.]

THE STATE OF WASHINGTON, *Respondent*, v.
BRENT R. ANDERSON, *Appellant.*

---

*A. O. Clemons, Jr.* (of *Bantz, Klobucher & Clemons*) and *C. E. Hormel,* for appellant.

*Richard W. Miller, Prosecuting Attorney,* for respondent.

DOLLIVER, J.—Defendant was convicted of first degree murder under RCW 9A.32.030(1)(b) for the death of his stepdaughter, Tanya Graff.

According to defendant's testimony, on the evening of June 24, 1977, Tanya, about 2 years of age, fell from her high chair. The following morning, defendant remained at home with his two stepchildren while his wife went to work at a beauty salon owned by defendant's cousin. During the morning as defendant and Tanya walked to the mailbox about two and one–half blocks from their home, defendant noticed Tanya limping and on one occasion falling. Defendant carried her the rest of the way to the mailbox, but she walked home.

Mrs. Anderson returned home to have lunch with the family. After lunch, they placed Tanya on the floor and she spit up her lunch. Mrs. Anderson gave her a baby aspirin and then discussed with defendant Tanya's limp and the earlier advice they had received from a clinic in Othello to soak the child's leg in warm water if she was limping. Mrs. Anderson then returned to work and defendant put Tanya down for a nap. After her nap, defendant noticed that Tanya was still limping so he decided to soak her leg in warm water in the bathtub.

Subsequent events during the treatment in the bathtub were testified to by defendant as follows: He drew the water to what he considered to be a normal bathtub temperature and put Tanya into the water which was just above her thigh as she sat in the bathtub. Defendant then added

some hot water. He held Tanya with his left arm and she sat with her hands on his arm while defendant circulated the water with his free hand. From time to time he added more hot water and circulated it.

The last time or two that defendant added water, he could not recall whether he circulated it with his hand. At that time, Tanya said, "Brent, hot." He then noticed that the gums around her teeth were white and that there was a bubble rising on her right leg above the knee. He lifted her from the tub and she slumped over and quit breathing. He laid her on the carpet in the hallway and administered mouth–to–mouth resuscitation. Defendant thought for a moment Tanya was dead.

Defendant ran to the front door of the trailer and called for Tanya's older brother who had been playing outside at the time of this occurrence and directed him to call his mother on the telephone. Defendant told his wife that Tanya was burned while he was soaking her leg.

Defendant then opened the drain in the bathtub. At that time there was no skin in the tub. Before the tub had finished draining, defendant started adding cold water. He placed Tanya in the tub lying down but held her head out of the water. He then turned on the cold water and circulated it, hoping to prevent her from going back into shock.

Defendant testified that Tanya did not cry during any of the events and that once in the cold water she revived considerably and talked to him.

After a short time, defendant took Tanya from the bathtub and into the master bedroom and called the Othello Community Hospital. He spoke to Nurse Schreck. Defendant claims he told the nurse what had occurred and was advised to put ice on the burned area. He also testified that he had been told he could put Vaseline on the burned area. On the other hand, Nurse Schreck testified defendant informed her that Tanya's ankle was a little red but that the skin was not broken or blistered. Nurse Schreck denied that she had advised Vaseline application but admitted she had advised other salves or ointments.

After speaking to Nurse Schreck, defendant again called the beauty shop and talked to his cousin. He then called the hospital and talked to Nurse Schreck a second time. Nurse Schreck testified that defendant now advised her the water was too warm and Tanya had been burned all over her legs and there was no skin on her legs. The nurse advised him to bring her to the hospital immediately. Defendant, however, put Tanya back in the tub of cold water and put ice in with her.

Defendant called the beauty shop again and told his cousin to send his wife home and for her to stop for a can of Foille on the way. He then called the hospital again, and was connected with Nurse McCaffee. The nurse testified that, from the telephone discussions with defendant, the hospital staff believed that the injuries to Tanya were not serious. Nevertheless, the nurse advised defendant to bring Tanya to the hospital.

After Mrs. Anderson arrived home, the couple took Tanya to the Othello Community Hospital. The attendants at the hospital noticed Tanya had a distinct line of burns around her body, but that she had no signs of burns to her hands, arms, or face and no evidence of splash burns. Moreover, no burns were noticed on the hands or arms of defendant.

At Othello Community Hospital, it was determined from the extent of Tanya's injuries that her condition was critical and, therefore, she was sent by ambulance to Sacred Heart Hospital in Spokane. She was placed under the care of Dr. Gerald Olmsted who described her injuries as second and third degree burns over approximately 60 percent of her body. Her chance of survival was poor. The doctor was aware of the suspicious circumstances of the injury prior to the time Tanya arrived in Spokane. After a few days, additional medical history was obtained, and Dr. Olmsted learned that in September 1976 while defendant and Mrs. Anderson were living together but not married, Tanya had been admitted to the hospital in Moses Lake suffering from a fractured clavicle and a fractured left leg.

Defendant and Mrs. Anderson drove to Spokane, visited the hospital, and then checked into the Clinic Motel. On June 25, 1977, defendant was arrested at the motel and charged with second degree assault. He was then driven to Ritzville in Adams County and booked into jail on June 26, 1977. Defendant gave the deputies a waiver so that they could enter, search and carry out any investigative activities necessary at his mobile home in Othello. During the investigation, skin was found in the bathtub.

The same day, June 26, defendant was arraigned on the charge of second degree assault. The court, on behalf of defendant, entered a plea of not guilty. The next day, defendant obtained counsel. On July 6, 1977, defendant entered an additional plea of not guilty by reason of insanity. A petition for competency examination upon a plea of not guilty by reason of insanity was granted. Defendant was admitted to Eastern Washington State Hospital under the order for competency examination on July 13, 1977, and remained at the hospital for 15 days.

Tanya was transferred to the Harborview Medical Center in Seattle on July 26, 1977. On August 6, 1977, she died from a blood clot. Two informations were filed on August 8, 1977: (1) charging defendant with murder in the first degree under RCW 9A.32.030(1)(b), and (2) charging defendant with manslaughter in the first degree under RCW 9A.32.060(1)(a). Service of process was made upon defendant in jail where he was still incarcerated under a charge of second degree assault. Defense counsel and the prosecuting attorney stipulated to a continuance of the arraignment until August 15, 1977. Meanwhile, the State was granted a voluntary dismissal of the first degree manslaughter charge. Defendant pleaded not guilty to the charge of first degree murder at his arraignment.

On August 30, 1977, venue was changed to Kittitas County, Washington. After numerous pretrial motions, trial commenced on October 11, 1977. Dr. Olmsted testified that, in his opinion, the burns to Tanya were not the result of an accident. Moreover, an attendant at Eastern State Hospital

was allowed to testify that defendant had told him he had previously injured Tanya. The trial jury convicted defendant of first degree murder and this appeal followed:

Three questions are presented to this court:

1. Was defendant denied his right to a speedy trial under CrR 3.3?

2. Were statements made by defendant to a hospital employee while there under an order for competency examination upon a plea of not guilty by reason of insanity pursuant to RCW 10.77.060 on a related charge of second degree assault admissible in the later trial on the subsequently filed charge of first degree murder?

3. Does the charge of first degree murder under RCW 9A.32.030(1)(b) apply in fact situations where the acts alleged were aimed at or intended and inflicted upon a specific individual and no other?

I

The CrR 3.3 issue is twofold. On August 8, 1977, two informations were filed, one charging defendant with first degree murder under RCW 9A.32.030(1)(b), and the other charging him with first degree manslaughter under RCW 9A.32.060(1)(a). On August 11, on motion by the State, an order was entered dismissing the manslaughter charge. Defendant was arraigned on the murder charge on August 15, and pleaded not guilty. No bail was allowed. On August 30, after a stipulated motion for change of venue had been filed, the venue was changed to Ellensburg and the trial date was set for October 11, 1977.

Defendant points out that 64 days had elapsed between August 8 and October 11, and thus CrR 3.3 was violated under the holding of this court in *State v. Striker,* 87 Wn.2d 870, 557 P.2d 847 (1976). Defendant's confidence in *Striker* is misplaced. In *Striker,* there was a delay of several months between the filing of the information and the date defendant was held to answer. We said:

As we have observed earlier, the rules contemplate that if the indictment or information is filed before arrest, the

accused will be promptly brought before the court if he is amenable to process. The rule we announce here applies only where, after the information has been filed, this procedure has not been followed. In order to protect the right of the accused, and in accordance with the manifest policy expressed in the rules, to discourage prosecutorial delays which are not approved by the court, we hold that in such circumstances a prosecution must be dismissed with prejudice on timely motion of the defendant, if it is not brought to trial within the time specified in CrR 3.3, after the information or indictment is filed.

*Striker,* at 877. Defendant cannot seriously contend the time between August 8 and August 15 is not sufficiently prompt between the filing of the information and arraignment so that this case comes within the bar of *Striker.*

Moreover, the record shows there was an opportunity to arraign defendant on August 8, but with the stipulation of counsel for defendant and the approval of the court that date was extended to August 15. Defendant cannot now be heard to assert the trial was not commenced in a timely manner.

The second CrR 3.3 claim is that, since the first degree murder charge is a crime based on the same conduct or arising from the same criminal episode as the second degree assault, the time commenced to run on June 27, 1977, when defendant was arraigned on the assault charge. Defendant asserts this matter is covered by the *ABA Standards Relating to Speedy Trial* which should be consulted "where a hiatus appears in CrR 3.3". *Striker,* at 873.

The *ABA Standards Relating to Speedy Trial* § 2.2 (Approved Draft, 1968), states:

When time commences to run.

The time for trial should commence running, without demand by the defendant, as follows:

(a) from the date the charge is filed, except that if the defendant has been continuously held in custody or on bail or recognizance until that date to answer *for the same crime or a crime based on the same conduct or arising from the same criminal episode,* then the time

for trial should commence running from the date he was held to answer;

(Italics ours.)

■ Defendant misapprehends the ABA Standards. They do not contemplate that the speedy trial time would be counted prior to the final act which made the crime complete: In this instance the death of the victim. The standards on speedy trial cannot go into effect until all of the elements of the crime have been completed. Here, the final and crucial element of the crime of first degree murder—the death of the victim—had to occur before time began to run. As indicated above, when this final element occurred, the defendant was brought to trial in a timely manner.

## II

At the trial, a hospital attendant at Eastern State Hospital, Dale Rysman, testified to a conversation he had with defendant at the hospital in which defendant made statements pertaining to previous injuries inflicted on Tanya. The record is clear that defendant came to Mr. Rysman and volunteered the information he now seeks to exclude.

■ Defendant was admitted to Eastern State Hospital under the provisions of RCW 10.77. He first seems to suggest that at all stages of his confinement at Eastern State Hospital he should have been entitled to have counsel at his elbow. No such extension of the right to counsel requirement is needed. The information given by defendant to Mr. Rysman was not the result of a custodial interrogation but was voluntarily given. Defendant's commitment to Eastern State Hospital was both at the instigation of and at the advice of counsel. Defendant cannot complain if, in an informal setting at Eastern State Hospital, he voluntarily came to Mr. Rysman and communicated with him.

■ Secondly, we held in *State v. Fagalde,* 85 Wn.2d 730, 539 P.2d 86 (1975), that in a proceeding involving child abuse no privilege exists. RCW 5.60.060(4). We said in

*Fagalde,* at page 736:

> Thus, we cannot accept the appellant's theory that confidential communications between the perpetrator and a psychologist, or a doctor, or a mental health center employee, are protected from disclosure and privileged in a judicial proceeding, according to the terms of the applicable statutes. Such protection might well be deemed to be in the public interest. But it is evident that, in its recent enactments, the legislature has attached greater importance to the reporting of incidents of child abuse and the prosecution of perpetrators than to counseling and treatment of persons whose mental or emotional problems cause them to inflict such abuse.

Our rules in *Fagalde* apply with equal force here.

■ Finally, although the general rule is that prior acts of misconduct are not to be admitted, exceptions have been developed to this rule including the admission of evidence to show the absence of accident or mistake. *State v. Goebel,* 40 Wn.2d 18, 240 P.2d 251 (1952). In an application of this rule in *State v. Terry,* 10 Wn. App. 874, 520 P.2d 1397 (1974), the Court of Appeals said:

> In a case of this nature, where the defendant asserts that a child has died as a result of an accident in the absence of any intent on his part to harm the child, evidence of prior and subsequent incidents involving the defendant's treatment of children, including the deceased, may be relevant and necessary to prove an essential ingredient of the state's case. This is particularly true in the case at bar where the defendant maintained in his own testimony that his physical actions toward children, including the deceased, were limited to occasional spankings. Under such conditions, the trial court properly could find that the relevance of the testimony to the contrary outweighed any possible prejudice to the defendant.

*State v. Terry, supra* at 883.

Defendant consistently maintained the death of Tanya was an accident. The testimony of Mr. Rysman contradicted this position and was admissible.

## III

Defendant was charged with and convicted of first degree murder under RCW 9A.32.030(1)(b), which reads:

(1) A person is guilty of murder in the first degree when:

. . .

(b) Under circumstances manifesting an extreme indifference to human life, he engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person; . . .

RCW 9A.32.030(1)(b) was enacted in 1975. Prior to that time, the statute read as follows:

The killing of a human being, unless it is excusable or justifiable, is murder in the first degree when committed either—

. . .

2. By an act imminently dangerous to others and evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual; . . .

Rem. Rev. Stat. § 2392.

In *State v. Mitchell*, 29 Wn.2d 468, 484, 188 P.2d 88 (1947), the court ruled on the precise question presented to us:

After careful consideration of Rem. Rev. Stat., § 2392, in the light of the authorities bearing on the question here under consideration, we believe that the weight of authority and the better reasoning support the conclusion at which we have arrived, namely, that where the act causing a person's death was specifically aimed at and inflicted upon that particular person and none other, the perpetrator of the act cannot properly be convicted of murder in the first degree under subdivision 2 of Rem. Rev. Stat., § 2392, on the theory that the act was imminently dangerous to others, evincing a depraved mind, regardless of human life, without a premeditated design to effect the death of any individual.

Ordinarily *Mitchell* would be decisive and we would find for the defendant. However, the State argues that the 1975 amendment changed the thrust of the law. Specifically, the

State claims that since the former statute referred to a person who commits "an act imminently dangerous *to others*" and the 1975 statute refers to a person who "engages in conduct which creates a grave risk of death *to any person*" it is now appropriate to charge a person with first degree murder whose "extreme indifference to human life" is directed toward one individual: the murdered person.

 Three inquiries must be pursued to determine the correctness of the State's contention: (A) the intent of the legislation, particularly with reference to any available legislative history; (B) regardless of any declared intention of the legislation, a comparison of the language of the two statutes to see if, from the actual wording, the change asserted by the State was actually made; and (C) considering RCW 9A.32, the homicide statutes as a whole, how can the chapter be most harmoniously construed. *See Burlington N., Inc. v. Johnston,* 89 Wn.2d 321, 326, 572 P.2d 1085 (1977).

## A

As to legislative intent, we are fortunate to have a record which contains significant evidence. First, the staff memorandum from the staff researcher of the Senate Judiciary Committee which comments on the changes to RCW 9A.32.030(1)(b), states: "Substantially the same as existing law—language 'evincing a depraved mind' changed to 'manifesting extreme indifference.'" Secondly, the transcript of the Senate Judiciary Committee meeting of January 16, 1975, in which this section of the then–proposed new criminal code was discussed, makes it clear that no change was intended in the type of circumstance toward which RCW 9A.32.030(1)(b) was to be directed. This meeting was attended by senators from both parties, including the chairman of the committee, a member of the Washington State Bar Association Task Force on the Criminal Code, the president of the Washington State Defender's Association, and the chief staff officer of the Washington

State Prosecuting Attorneys' Association. Without question, those discussing this section, including the members of the committee, believed and stated that it referred to "situations such as the Bellevue sniper firing at people indiscriminately, hitting a couple of them; tossing a bomb into a room with complete indifference as to whether it goes off; that sort of thing".

In response to this direct *legislative* evidence of intent, the State points to G. Mooney & G. Golob, Washington State Criminal Justice Training Commission, *Revised Criminal Code Training and Seminar Manual,* RCW 9A.32.030(1)(b) (1976), and WPIC § 26.05, at 157 (1977), both of which assert the 1975 statute "covers behavior which may expose only one person to danger". While these publications may interpret legislative intent, they are removed from the legislative process and should be given far less weight than statements made by legislative staff reports and by legislators and others participating in the hearing.

## B

As is brought out in *State v. Mitchell, supra,* the leading case on the interpretation of the former statute is *Darry v. People,* 10 N.Y. 120 (1854). Here the New York court interpreted the statute upon which our former statute was patterned. Much of the analysis of the New York court is applicable both to the pre–1975 and to the post–1975 statute. To understand more easily the similarities of and differences between the statutes, they may be read as follows:

Pre–1975 (Rem. Rev. Stat. § 2392):

[First degree murder is when a person] evincing a depraved mind, regardless of human life, [commits] an act imminently dangerous to others without a premeditated design to effect the death of any individual.

Post–1975 (RCW 9A.32.030(1)(b)):

[First degree murder is when] under circumstances manifesting an extreme indifference to human life, [a

person] engages in conduct which creates a grave risk of death to any person and thereby causes the death of a person.

An analysis of the language shows first that the statutes speak of "evincing a depraved mind, regardless *of human life*" and "manifesting an extreme indifference *to human life*". (Italics ours.) In *Darry v. People,* at page 156, Judge Denio observed:

> The act must evince a depraved mind, *regardless of human life.* These words are exactly descriptive of general malice, and cannot be fairly applied to any affection of the mind having for its object a particular individual. They define general recklessness, and are not pertinent to describe cruelty to an individual. The act by which the death is effected must *evince* a disregard to human life. Now, a brutal assault upon an individual may evince animosity and hate towards that person, and a cruel and revengeful disposition, but it could not properly be said to be evidence of a recklessness and disregard of human life generally. Take the case of death ensuing from an intentional immoderate punishment of a servant. The act would be evidence of a disregard of the life of the servant, but not of human life in a general sense. The life of every one, we know, is a human life; but the words are used in this enactment in a general sense, as clearly as when we speak of the uncertainty of human life, or the miseries, the pleasures, or the vanity of human life.

The statutes refer to "effect[ing] the death *of any individual*" and "caus[ing] the death *of a person*". (Italics ours.) Again, quoting from Judge Denio, at page 156, "Why did not the legislature say, [the death] *of the person killed?* or, if it were intended to embrace both general and particular malice, *of the person killed, or of any particular individual?*" This argument applies with equal force to the language of the 1975 statute. If the legislature had meant the interpretation urged by the State, the legislature would have said "and thereby cause the death of *that* person" rather than simply "*a person*".

Finally, contrary to the assertion of the State, the term "others" does not refer only to more than one person.

Rather, it means one or more persons separate and distinct from oneself. For example, as appellant states:

> Two men are alone in a building; the building catches fire, one flees and the other who is trapped calls for assistance. The fleeing man replies, "I haven't the time to think of others." The response, though cowardly, is correct.
>
> A man sells me a rare gem at a bargain price. I inquire, "how many others have you?" He responds, "One."

And, of course, The Golden Rule, "Do unto others" refers to one or more persons other than oneself.

The analysis in *State v. Mitchell, supra,* and the cases cited therein still applies to the 1975 statute. It must be pointed out, however, that the New York Court of Appeals has held the amended New York statute, similar in many respects to our statute, overcomes the problems pointed out in *Darry v. People, supra. People v. Poplis,* 30 N.Y.2d 85, 281 N.E.2d 167, 330 N.Y.S.2d 365 (1972). *See* New York Penal Law § 125.05–125.27 (McKinney 1975). Nevertheless, we believe our disposition in this case is correct: (1) In contrast to the New York court, we rely on actual legislative history rather than simply the opinions of commentators as to legislative intent. (2) The New York court does not attempt to analyze the significance of the change in the law nor to distinguish *Darry v. People, supra.* It simply asserts, "The statute is sufficiently definite and the kind of conduct described is sufficiently laid out to sustain a valid penal sanction." *People v. Poplis, supra* at 89. We believe our analysis of the 1975 statute to be more persuasive. (3) The New York statutes relating to homicide generally are significantly different from those in Washington. The problems pointed out in harmonizing the Washington statute are not present in the New York statutory scheme. See section C, *infra.*

## C

The State's position would result in a disharmonious construction of RCW 9A.32. *See Publishers Forest Prods. Co. v. State,* 81 Wn.2d 814, 505 P.2d 453 (1973). Second

degree murder would be effectively eliminated. Every "intent to cause the death" (RCW 9A.32.030(1)(a), (b)), would be an "extreme indifference to human life" and conduct which "creates a grave risk of death", *i.e.*, first degree murder. Or, if there is no "intent", the conduct would be reckless or negligent—which is covered by first and second degree manslaughter. RCW 9A.32.060–.070. *See Darry v. People, supra* at 158.

The State points to a subsection of the aggravated murder statute as requiring its interpretation of RCW 9A.32-.030(1)(b). RCW 9A.32.045(1)(f) reads:

In a special sentencing proceeding under RCW 10.94-.020, the following shall constitute aggravating circumstances:

. . .

(f) There was more than one victim and the said murders were part of a common scheme or plan, or the result of a single act of the defendant.

Several things should be noted as to (1)(f). It was first framed in 1975 in Initiative 316, an initiative relating to the death penalty, the crimes punishable by death, and the procedures to be used in pronouncing the death penalty. Initiative 316 was amended in 1977 and RCW 9A.32-.045(1)(f) became effective on June 10, 1977. Thus, it was the law at the time of the incident leading to the death of Tanya.

One of the significant changes made in the 1977 statute is that, while under the 1975 act—which was actually cited by the State—the aggravated murder provisions (RCW 9A.32-.045 and 9A.32.046) arguably referred to RCW 9A.32-.030(1)(b) and (c), under the 1977 amendments the aggravated murder provisions specifically refer only to RCW 9A.32.030(1)(a). RCW 9A.32.030(1)(a) reads:

(1) A person is guilty of murder in the first degree when:

(a) With a premeditated intent to cause the death of another person, he causes the death of such person or of a third person; . . .

In the language of RCW 9A.32.046:

> Once a person is found guilty of murder in the first degree under RCW 9A.32.030(1)(a) with one or more aggravating circumstances and without sufficient mitigating circumstances to merit leniency and the jury has made affirmative findings on both of the special questions submitted pursuant to RCW 10.94.020(10), neither the court nor the jury shall have the discretion to suspend or defer the imposition or execution of the sentence of death. The time of such execution shall be set by the trial judge at the time of imposing sentence and as a part thereof.

This means that the aggravating circumstances of RCW 9A.32.045 refer only to a murder when there is "a premeditated intent to cause the death of another person". Thus, if there is premeditation and a common plan or scheme and more than one person is killed it is an aggravating circumstance. Likewise, if there is premeditation but no common plan or scheme and more than one person is killed it is still an aggravating circumstance. This makes the sections completely harmonious with the homicide statutes and coupled with the previous analysis of RCW 9A.32.030(1)(b) makes RCW 9A.32 a harmonious whole.

We hold it was error for the trial court to fail to grant defendant's motion to dismiss the charge of first degree murder brought under RCW 9A.32.030(1)(b). This does not mean that the accused could not properly have been charged under other sections of RCW 9A.32. That is, however, a decision to be made by the prosecuting attorney.

Reversed.

UTTER, C.J., and ROSELLINI, STAFFORD, WRIGHT, BRACHTENBACH, HOROWITZ, HICKS, and WILLIAMS, JJ., concur.