Steven SATTER, Petitioner
and Appellant,

v.

Herman SOLEM, Respondent
and Appellee.

No. 15731.

Supreme Court of South Dakota.

Considered on Rehearing Aug. 29, 1988.

Decided Jan. 4, 1989.

Janine Kern, Asst. Atty. Gen., Pierre, for respondent and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Richard Braithwaite, Sioux Falls, for petitioner and appellant.

MORGAN, Justice (on rehearing).

This case, before us on rehearing, is an appeal from the decision of the trial court (habeas court) denying habeas corpus relief to Steven Satter (Satter) from two convictions of murder. We reverse and remand.

The habeas court determined that Satter voluntarily and knowingly made certain admissions to Codington County Sheriff Berg (sheriff), notwithstanding the fact that he had not been given *Miranda* warnings, and that such inquiry was investigatory rather than accusatory. The original opinion, reversing the habeas court, was filed April 20, 1988, and is found at 422 N.W.2d 425 (S.D.1988) (*Satter I*). In that decision, two Justices voted to reverse the habeas court on the grounds that Satter's statements to the sheriff at the April 2, 1973, interrogation should not have been admitted in evidence because they were involuntary. Two Justices (hereinafter referred to as the dissent) held to the contrary and voted to affirm. One Justice joined in the reversal on the grounds that Satter had received ineffective assistance of counsel.

State's petition for rehearing was granted but limited to two issues, namely:

(1) Whether [Satter's] statements to Sheriff Berg were voluntary and admissible; and

(2) Whether [Satter] was denied effective assistance of counsel due to his trial counsel's failure to object to the admission into evidence of two exhibits.

After additional briefing and oral arguments, we determine that the first issue is dispositive and that Satter's statements to the sheriff were not voluntary and are therefore inadmissible. Presumably, the conduct of counsel complained of in the second issue will be avoided upon retrial.

We summarize the factual background as it relates only to the first issue. At all times pertinent, Satter was in custody in the Codington County Jail on burglary charges. He was questioned by law enforcement officers on several occasions regarding those burglaries and on each of those occasions Satter was fully advised of his *Miranda* rights in advance of questioning.

In the meantime, the sheriff's office was also investigating the disappearance of two local men. Late in the evening on April 1, 1973, the sheriff received an anonymous telephone tip on the location of the bodies of the missing men and the suggestion that Satter was connected. The next day, after an unsuccessful attempt at locating the bodies per the telephone information, the sheriff visited Satter in the jail. Without any attempt to mirandize Satter, the sheriff first interrogated him about some burglaries in the area. He then changed the line of interrogation by asking Satter if he knew anything about two bodies supposedly buried in the Watertown vicinity.*

The sheriff testified at trial that when first asked about the bodies, Satter posed a hypothetical question to the effect: If he had been paid to go out and destroy two bodies that are buried, what could he be charged with? The sheriff responded that he could possibly be charged with being an accessory. After some further conversation, Satter gave the sheriff detailed directions to find the location of the bodies. Next, Satter told the Sheriff that some third person from Minneapolis named Deluci, who had apparently killed the two men, offered him money to burn the bodies. Satter stated that he had not done so because of the smell of the bodies. The sher-

iff followed Satter's directions and recovered the bodies. The Division of Criminal Investigation was called in to assist in the investigation and Satter was properly advised of his *Miranda* rights before any further interrogation.

State has admitted at all stages of the appeal that the sheriff failed to give Satter any *Miranda* warning immediately prior to the commencement of interrogation on the date in question. State urges, however, that such a warning was unnecessary *in this case*. This position is based on four major premises. First, the sheriff's inquiry, at that point, was merely investigatory, not accusatorial, because he had no known crime and Satter was not a suspect. Secondly, Satter, who was not a stranger to the criminal justice system, knew, understood and waived his *Miranda* rights, thus the failure to give him the warning was merely a technical omission. Thirdly, Satter's story about Deluci was a fabrication and there was nothing said incriminating Satter with the offense of murder. Lastly, there were no deliberately coercive or improper tactics used to warrant a presumption of compulsion.

With respect to the first premise, we pointed out in *Satter I* that the question was not whether the inquiry was investigatory or accusatory, but whether the interview was *custodial*. The record discloses that the interview in question was held in an office at the Watertown Police Department while Satter was in custody.

The *Miranda* Court stated:

> The principles announced today deal with the protection which must be given to the privilege against self-incrimination when the individual is first subjected to police interrogation *while in custody at the station* or otherwise deprived of his freedom of action in any significant way. (Emphasis added.)

*Miranda v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694,725 (1966).

Custodial interrogation was again the background for the United States Supreme

---

* Satter contends that the sheriff also told him that anything that Satter said would be confidential. When questioned at trial, the sheriff testified that he did not remember making such a promise.

Court's decision in *Edwards v. Arizona,* 451 U.S. 477, 481–82, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378, 384 (1981), wherein the Court reaffirmed the language in *Miranda* which required that "custodial interrogation be preceded by advice to the putative defendant that he has the right to remain silent and also the right to the presence of an attorney." This was reiterated in *Arizona v. Roberson,* 486 U.S. ——, ——, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704, 712 (1988), wherein the court stated that a major purpose of *Miranda* "was 'to give concrete constitutional guidelines for law enforcement agencies and courts to follow.' 'As we have stressed on numerous occasions, "[o]ne of the principal advantages" of Miranda is the ease and clarity of its application....' " (Citations omitted.)

■ For the sake of argument, if we were to agree that the sheriff's initial inquiry was somehow protected from *Miranda,* we firmly believe that at the point where Satter proposed his hypothetical question the sheriff was on notice that Satter was or could be involved in some criminal activity. At that point, he should have immediately given Satter the requisite warning. The procedure is so simple that there is no excuse for not following it. We prefer to adhere to the bright line rule, rather than start carving exceptions.

■ The second premise is equally unimpressive. That premise is that Satter knew, understood and waived his *Miranda* rights; that he was not a stranger to the criminal justice system and had been previously warned on some burglary interrogations. Therefore, it is argued, the failure to give the warning was only a technical omission.

In *Miranda,* we find the Court's reasoning that since it has always set high standards of proof for the waiver of constitutional rights and since the State establishes the circumstances under which the interrogation takes place, the heavy burden to demonstrate a waiver of the privilege against self-incrimination rightfully rests on the shoulders of the State. 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724. Neither the State nor the dissent in *Satter*

*I* have cited any cases wherein the United States Supreme Court has upheld admission of any statements taken at custodial interrogation where such interrogation was not commenced by the giving of the *Miranda* warning.

The suggestion that Satter's previous experience with the criminal justice system excuses the giving of any warning is rather unique. The State, and the dissent in *Satter I,* seem to suggest that there should be some sort of intelligence test. If the suspect has four previous convictions, he is sufficiently knowledgeable of his *Miranda* rights. But what if there are three convictions, two, or only one? Where do we draw the line? More importantly, where do the law enforcement authorities draw the line? They are the ones in the field. The creation of exceptions really does them no favor. Far better to adhere to the bright line rule. After all, it requires no great effort to take out the *Miranda* card, read the subject his rights, and ask the simple questions: Do you understand your rights and do you waive them?

■ The third premise is to the effect that since Satter's response was a fabrication, he did not incriminate himself. If all that Satter had done was to tell the story about Deluci from Minneapolis, we would tend to agree. At least we would not find it sufficiently prejudicial to require reversal of the convictions. What is conveniently overlooked by the State and the dissent in this argument, is that the statements detailed the location of the bodies. To suggest that that information was not incriminating ignores reality. Satter's knowledge of the exact location of those bodies was the first direct evidence that linked him with the murders. Nothing else was done until after the bodies were recovered. No further interrogations were had, no attempt at lie detector tests was made, no confession was made until after that information was acted upon. Absent those directions, the bodies might still be moldering in their grave under the rock pile. However, we need not speculate on that. In fact, Satter gave the sheriff the di-

rections and implicated himself in the crime.

■ The final premise that we deal with is that there were no deliberately coercive or improper tactics used to warrant a presumption of compulsion. In other words, absent the use of the rubber hose, icy showers or marathon interrogations under bright lights, we should *not* presume that Satter's statements were involuntary.

In *Oregon v. Elstad*, 470 U.S. 298, 307, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222, 231 (1985), we find the following language:

> Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm. (citations omitted).
>
> But the Miranda presumption, though *irrebuttable* for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted. Despite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination. (Cites omitted.) (Emphasis added.)

This passage completely negates the premise as applied in this case.

What then is the effect of these involuntary admissions on Satter's convictions in light of the "fruit of the poisonous tree doctrine" announced in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)? Since the habeas court's ruling that the statements were voluntary did not require it to consider the implications of involuntariness and the *Wong Sun* doctrine, we do not consider it appropriate for us to pass on this question. Rather, it is more appropriate that the habeas court consider this issue on remand.

WE REVERSE AND REMAND.

HENDERSON and SABERS, JJ., concur.

WUEST, C.J., and MILLER, J., dissent.

MILLER, Justice (dissenting).

I dissent. In addition to the following, I hereby specifically incorporate my dissent in *Satter v. Solem*, 422 N.W.2d 425 (S.D. 1988) (Satter I).

I

Aside from a smattering of obligatory citations to a few decisions handed down by the United States Supreme Court, the majority relies solely upon the Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). By so doing, the majority fails to consider or appreciate the Supreme Court's writings on the issue of custodial interrogations in the twenty-two years which have passed since *Miranda* was initially handed down. Most importantly, the majority completely misunderstands and misapplies the Supreme Court's holding in *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), a decision which is *directly on point* with the case now before us.

In order to fully appreciate the applicability of *Elstad* to this case, it is necessary to recite some of the facts found therein. In December 1981, a home in Salem, Oregon, was burglarized. Missing were art objects and furnishings valued at $150,000. A witness to the burglary contacted the county sheriff's office implicating 18–year-old Michael Elstad in the burglary. Two officers then went to the home of Elstad's parents with a warrant for his arrest. The officers spoke with Elstad in his parents' living room concerning the burglary. One officer indicated that he felt that Elstad was involved in the burglary, and Elstad stated "Yes I was there." Elstad was then escorted to the sheriff's office where he was later advised of his *Miranda* rights, which he waived. He then proceeded to give a full statement implicating himself and others in the crime. Elstad was

charged and convicted of first-degree burglary. Elstad appealed, contending that his oral statement and signed confession should have been suppressed. The Oregon appellate court reversed, holding that his initial statement ("I was there") was inadmissible as having been given without the prescribed *Miranda* warnings, and that the later signed confession was also inadmissible due to the taint on Elstad's initial statement. The United States Supreme Court granted certiorari and held that *the Fifth Amendment does not require the suppression of a confession made after proper Miranda warnings and a valid waiver of rights solely because the police had obtained an earlier voluntary but unwarned admission from the suspect.*

The similarities between *Elstad* and Satter are obvious. Like Michael Elstad, Steven Satter was not yet a suspect when he made his initial incriminating statement. Further, like Elstad, Satter initially incriminated himself without having been warned, and continued to incriminate himself after having received the *Miranda* warnings in interrogations conducted by a Division of Criminal Investigation (DCI) Agent four days and ten days after his initial unwarned statement. Finally, as in *Elstad* (where the police conceded that the questioning in Elstad's living room was custodial), Satter was in custody on a probation violation at the time he made his initial incriminating statement.

The majority in this case concludes that as a result of Satter's initial unwarned statement, the "fruit of the poisonous tree" doctrine announced in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed. 2d 441 (1963), is somehow applicable. However, the Supreme Court in *Elstad* held that such is not necessarily the case. It stated that fundamental differences exist between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against prosecutorial use of compelled statements as prohibited by the Fifth Amendment. *Elstad*, 470 U.S. at 304, 105 S.Ct. at 1290, 84 L.Ed.2d at 228–29. *See also New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Michigan v. Tucker*, 417 U.S. 433,

94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). It further noted that the failure to administer the *Miranda* warnings does not necessarily breed "the same consequences as police infringement of a constitutional right, so that evidence uncovered following an unwarned statement must be suppressed as 'fruit of the poisonous tree.'" *Elstad*, 470 U.S. at 304, 105 S.Ct. at 1290, 84 L.Ed.2d at 229. The majority here "misconstrues the nature of the protections afforded by *Miranda* warnings and therefore misreads the consequences of police failure to supply them." *Id.*

The majority opinion states that the proper inquiry in determining whether Satter's statements are admissible is whether Satter's interview was custodial. Following that line of reasoning, the majority then determines that because the initial interview was custodial, any unwarned statements therein must be suppressed. However, as noted by the Supreme Court, the focus *should not* be upon whether the interrogation was *custodial* (as was conceded in *Elstad*) but rather whether the statement was *coerced.* "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *See Elstad*, 470 U.S. at 305, 105 S.Ct. at 1291, 84 L.Ed.2d at 229 *citing United States v. Washington*, 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 245 (1977). Moreover, the Court noted that

> there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary. *The relevant inquiry is whether, in fact, the second statement was also voluntarily made.* As with any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. (Emphasis added.)

*Elstad*, 470 U.S. at 318, 105 S.Ct. at 1297–98, 84 L.Ed.2d at 238 (footnote omitted).

There is no doubt that Satter, who was in jail on a probation violation, was indeed in

custody at the time Sheriff Berg initially made inquiry of him regarding the whereabouts of the two bodies. However, the question is not whether a suspect is in custody; rather, it is whether the suspect made his initial statement voluntarily. Voluntary statements remain a proper element in law enforcement. *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630, 16 L.Ed.2d at 726. Far from being prohibited by the Constitution, "admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *Elstad,* 105 S.Ct. at 1291 *quoting United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238, 245 (1977). Moreover, when neither the initial nor the subsequent admission of a suspect is coerced, "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Elstad,* 470 U.S. at 312, 105 S.Ct. at 1294–95, 84 L.Ed.2d at 234.

For the sake of argument, even if Satter's first statement was coerced, the Supreme Court has recognized that the coercive effect of a confession can be ameliorated. Even in such extreme cases as *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944), in which police forced a full confession from the accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated. *See also Westover v. United States,* 384 U.S. 436, 496, 86 S.Ct. 1602, 1639, 16 L.Ed.2d 694, 736 (1966) (a companion case to *Miranda*). Here, Satter had four days and later ten days between his unwarned statement to Sheriff Berg and his warned statements to Agent Petersen. If there was any coercion here, which I certainly do not concede, the passage of time dissipated its effect. *Lyons, supra; Westover, supra.*

The majority argues that there is little difference between the unwarned and noncoercive questioning which took place in this case and "the use of the rubber hose, icy showers, or marathon interrogations under bright lights." Nonsense!! There is "a vast difference between the direct consequences flowing from coercion of a con-

fession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question[.]" *Elstad,* 470 U.S. at 312, 105 S.Ct. at 1295, 84 L.Ed.2d at 234. Justice Brennan, in his dissent to *Elstad,* mustered an entire "parade of horrors" as examples of confessions which were coerced by law enforcement through the use of torture, force or violence, contending that it is impossible to perceive any causal distinction between the facts in *Elstad* and one involving a confession that was coerced by torture. The majority discounted Justice Brennan's contention as being "wholly unpersuasive." I agree.

Finally, I note, as did the Court in *Elstad,* that it is an unwarranted extension of *Miranda* to hold that a "simple failure to administer the *[Miranda]* warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Elstad,* 470 U.S. at 309, 105 S.Ct. at 1293, 84 L.Ed.2d at 232. While *Miranda* requires that an unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made. As a result, absent deliberately coercive or improper tactics in obtaining the initial statement (which certainly are not present here) the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that preclude the admission of the earlier statement. *See Elstad,* 470 U.S. at 314, 105 S.Ct. at 1296, 84 L.Ed.2d at 235.

The similarities between *Elstad* and Satter are most obvious. Therefore, the conclusion which we reach should be the same as that reached by the United States Su-

preme Court, namely Satter's written, warned statement should not be suppressed. Perhaps the majority can explain why, on one hand, it bases its holding on various cases decided by the United States Supreme Court and then decides the ultimate issue in direct contradiction to that Court's latest holding on nearly an identical fact/law issue! Perhaps this issue may be ultimately resolved by the United States Supreme Court on a grant of certiorari.

## II

Although not addressed by the majority, I must write on the issue of ineffective assistance of counsel because of Justice Sabers' dissent in *Satter I*. (I must assume that Justice Sabers agrees with my analysis under the first issue, since he stated in his prior dissent that "upon remand and retrial, the Issue I statements from the defendant should be excluded unless found to be clearly voluntary." *Satter I*, 422 N.W.2d at 430 (Sabers, J., concurring in result). The habeas court specifically found the statements to be voluntary and that finding is not clearly erroneous. See the authority cited above and in my prior dissent, with which Justice Sabers did not take issue.)

Attorney Hackett's conduct in representing Satter did not descend to the level of ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), establishes the two steps for determining ineffective assistance of counsel: (1) the defendant must show that counsel's performance was deficient and (2) the defendant must show that the deficient performance prejudiced the defense. *Strickland* also requires that a court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. Further, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Moreover, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in a

particular case, and that there is a strong presumption that counsel had rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066, 80 L.Ed.2d at 695. This court has recognized that we will not second-guess a defense counsel's judgment if the acts complained of appear to be legitimate trial tactics. *Jibben v. State*, 343 N.W.2d 788 (S.D.1984); *State v. Tchida*, 347 N.W.2d 338 (S.D.1984).

Most of the concern surrounding the question of ineffective assistance of counsel relates to the introduction at trial of Exhibits 21 and 49, which were Satter's sworn statements. Specifically, the statements noted that: "This statement is given with the understanding that a polygraph test will be offered to me at a future date. Also that the State will not contest or object to the polygraph test being offered as evidence in court."

By our standards, if there is *any conceivable legitimate trial strategy* in allowing the admission of the written statement, then the conviction must be upheld. *See State v. Dornbusch*, 384 N.W.2d 682 (S.D. 1986); *State v. Anderson*, 387 N.W.2d 544 (S.D.1986).

As noted by the habeas court, attorney Hackett may have had several valid reasons for acquiescing in the admission of Satter's written statements without having excised that part of the statement referring to a polygraph test. As the habeas court noted, the statement was actually "a double-edged sword." Satter had taken several polygraph examinations; some were passed and some were failed. Satter failed polygraph examinations dealing with the subject matter contained in his statement. However, Satter contended that he failed the polygraph dealing with the contents of his statement because of his mistaken belief as to the possible defense of self-defense. Satter did, however, pass a polygraph examination concerning a homicide in western South Dakota and another polygraph concerning some burglaries. As noted by the habeas court, attorney Hack-

ett, on cross-examination, secured a surprising admission from DCI Agent Petersen to the effect that Petersen believed Satter's statement to be the truth. Further, Satter testified that his statement was the truth. Thus, since Petersen and Satter had both contended that Satter's statement was the truth, and since there was no testimony that Satter had failed a polygraph examination concerning his statement, the jury could deduce that the statement was in fact true. This is the converse of Satter's proposition that the portion of his statement relative to a polygraph examination would indicate to the jury that Satter had failed another polygraph due to the lack of testimony on that subject. The habeas court noted:

> [W]hat Attorney Hackett was able to do in effect was to have one of the State's chief witnesses, Delbert Petersen DCI Agent, corroborate the veracity of Exhibit 21 [Satter's statement]. It is my opinion that Hackett's actions regarding Satter's written statements were part of a *legitimate trial tactic.* Satter's allegations are not sufficient to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, or in other words, does not constitute action which might not be considered solid trial strategy. (Emphasis added.)

It should also be noted that an interesting colloquy between attorney Hackett, Satter and the court took place in chambers at the close of Satter's original trial. When asked if Satter had participated in the trial of his case in connection with picking the jury, Satter replied "Yes." Further, Satter approved the jury as it was selected, and admitted to having been consulted throughout the trial concerning questions and decisions that were made. When asked by the court whether he felt "that your attorney has done a tremendous job for you," Satter replied "Yes I do."

Finally, it should be noted that at the time of the original trial attorney Hackett was a highly respected trial lawyer, having practiced for thirty years. He was known as a tenacious advocate with a wealth of trial experience. I observe, with a great deal of concern, that Satter now complains of Hackett's strategy and performance some thirteen years after trial and years after Hackett has died. Memories have faded concerning the actual occurrence of events which culminated in Satter's conviction and Hackett is not here to defend his performance. Trying to establish whether Hackett's actions constituted ineffective assistance is greatly hindered by his death, leaving us with nothing but a cold record and the testimony of others (including Satter himself, who has a vested interest in tarnishing Hackett's performance) by which to determine the legitimacy of his tactics. As stated earlier, given the state of the record as it exists, I am convinced that Hackett's performance did not fall below that which was required of him as an attorney at law. Any assertion to the contrary simply is not supported by the record.

I would affirm the circuit court.

I am authorized to state that Chief Justice WUEST joins in this dissent.