1996 SD 9

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Steven Allan SATTER, Defendant and Appellant.**

No. 18574.

Supreme Court of South Dakota.

Considered on Briefs Nov. 29, 1995.

Decided Jan. 31, 1996.

Mark Barnett, Attorney General, Ann C. Meyer, Assistant Attorney General, Pierre, for plaintiff and appellee.

Steven R. Binger, of Binger Law Office, Sioux Falls, for defendant and appellant.

SABERS, Justice.

[¶ 1] Satter appeals from a conviction of two counts of murder after re-trial.

## FACTS

[¶ 2] Satter was tried and convicted of two counts of unpremeditated murder in 1974. He was sentenced to two concurrent life terms without possibility of parole. His conviction was affirmed on direct appeal. *State v. Satter,* 90 S.D. 485, 242 N.W.2d 149 (1976) (*Satter I*). In his direct appeal, he asserted, among other things, that there was insufficient evidence of the depraved mind required for second-degree murder and that there was insufficient evidence to counter his claim of self-defense. The South Dakota Supreme Court found the evidence was sufficient. The court noted that, notwithstanding his claim of self-defense, Satter testified at trial that he had shot the victim in the back of the head after the victim had already been shot twice. *Id.* at 151–52.

In 1986, Satter filed a petition for post-conviction relief in the South Dakota state courts. He raised these issues: 1) voluntariness of statements to police; 2) ineffective assistance of counsel; and 3) inadequate jury instructions. (Citation omitted). The state habeas court denied his petition ..., but the South Dakota Supreme Court later reversed, holding that certain statements should not have been admitted into evidence. *Satter v. Solem,* 422 N.W.2d 425, 428 (S.D.1988) (*Satter II*). The state petitioned for a

rehearing, which was granted, on the limited issues of the voluntariness of a statement and ineffective assistance of counsel. *Satter v. Solem,* 434 N.W.2d 725 (S.D. 1989), *cert. denied sub nom. Rist v. Satter,* 490 U.S. 1091, 109 S.Ct. 2432, 104 L.Ed.2d 989 (1989) (*Satter III*). The statement at issue was found involuntary and the case was remanded to the habeas court for determination of the effects of the statement under the "fruit of the poisonous tree doctrine" announced in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *Satter III,* 434 N.W.2d at 728. On remand, the habeas court denied relief ... but was again reversed. *Satter v. Solem,* 458 N.W.2d 762 (S.D.1990) (*Satter IV*). The South Dakota Supreme Court granted the writ of habeas corpus, vacated Satter's conviction and held that he [was] entitled to a new trial. *Id.* at 770.
*Satter v. Leapley,* 977 F.2d 1259, 1260–61 (8th Cir.1992).

[¶ 3] The State filed an Amended Information on May 28, 1993, charging Satter with two counts of depraved mind murder in violation of 22–16–7 (1972 codification).

[¶ 4] On August 20, 1972, Satter went to the trailer house of Kent Engle and Jerry Bowling, located on Pelican Lake in Codington County, South Dakota. He took with him a gun and nude photographs of his sister, Marianne Satter, which he found in Engle's car. He entered the trailer and shot both Engle and Bowling. He returned later and put the bodies in the bathroom of the trailer. He returned again the same day and moved the bodies to a rock pile south of Kranzburg, South Dakota. At some point, Satter cleaned the walls of the trailer.

[¶ 5] After receiving certain information from an anonymous caller, Codington County Sheriff Curtis Berg found the two bodies on April 2, 1973. Delbert Peterson, a Division of Criminal Investigation agent, interviewed Satter on April 5, 1973 after advising Satter of his *Miranda* rights. On April 11, 1973, Peterson interviewed Satter again, after re-advising him of his *Miranda* rights. Satter took a polygraph examination, but failed. On April 11 and 12, 1973, Satter signed state-

ments admitting he shot the two men after they drew guns. The statements were signed on the condition that the State allow him a polygraph examination to prove his self-defense theory. However, no second polygraph examination was offered before Satter's first trial.

[¶ 6] The State offered Satter a polygraph examination on April 3, 1991 and reaffirmed this offer on May 17, 1993. Satter did not take a polygraph examination. Satter asserted self-defense at trial, stating he shot Engle when Engle pointed a gun at him after their discussion. He also claimed he shot Bowling when Bowling entered the room and drew a gun.

[¶ 7] Following the new trial, Satter was again convicted of two counts of depraved mind murder and sentenced to two concurrent life sentences. He appeals and we affirm.

### [¶ 8] 1. Did the Amended Information and jury instructions omit an element of the charged offense?

[¶ 9] Satter was charged under SDCL 22–16–7 (1972 codification), which provided:

Homicide is murder when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

[¶ 10] Satter claims the Amended Information was in error for two reasons: the offenses were called second degree murder, which was not known in 1972, and there was no indication that to be convicted of depraved mind homicide, the act had to be committed "without any premeditated design to effect the death of any particular individual."[1] He also claims the jury was incorrectly instructed on the elements of the crime because jury instructions did not indicate lack of intent as a separate element of depraved mind murder.

[¶ 11] Satter did not object to the Amended Information or the jury instruction

on elements of the crime. "Ordinarily, '[f]ailure of a court to correctly or fully instruct the jury is not reviewable unless an objection was made or a written instruction correctly stating the law was requested.'" *State v. Otto*, 529 N.W.2d 193, 195 (S.D.1995) (quoting *State v. Oster*, 495 N.W.2d 305, 312 (S.D. 1993)). Satter asserts the plain error doctrine. SDCL 23A–44–15.

"[T]he plain error rule must be applied cautiously and only in exceptional circumstances." Our inquiry must be whether or not the error affects [defendant's] *substantial* rights and thereby prejudiced him.

*State v. Davi*, 504 N.W.2d 844, 855 (S.D.1993) (quoting *State v. Brammer*, 304 N.W.2d 111, 114 (S.D.1981) (Emphasis original)).

[¶ 12] First, we address the Amended Information charging Satter with second degree murder. An information is not evidence. *State v. Abdo*, 518 N.W.2d 223, 224 (S.D.1994). The jury was specifically instructed not to regard it as such.

The purpose of an Indictment or Information is to apprise a defendant of the nature of the charges against him with sufficient specificity so that he may defend against the charges and may later plead the Indictment or Information as a bar to a subsequent charge.

*State v. Arguello*, 519 N.W.2d 326, 328 (S.D. 1994). Satter makes no claim that his ability to defend himself on the charges was compromised because of the Amended Information. Therefore, we cannot find any substantial right affected by the minor error in the Amended Information.

[¶ 13] Next, we consider the jury instructions. The jury was instructed:

It is provided by a statute of this state that homicide, the killing of one human being by another, is murder when perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any pre-

---

1. In 1972, murder was not divided into degrees, but was defined in three ways:
   1. premeditated murder (SDCL 22–16–4);

2. depraved mind murder (SDCL 22–16–7); and
3. felony murder (SDCL 22–16–9).

meditated design to effect the death of any particular individual.

and:

The elements of the offense of murder as charged in the Information, each of which the state must prove beyond a reasonable doubt, are:

1. That the Defendant at the time and place alleged in the information caused the death of Jerry Wayne Bowling [repeated for Kent Engle].

2. That the Defendant did so by an act imminently dangerous to others evincing a depraved mind, regardless of human life.

3. That the killing was not excusable or justifiable.

[¶ 14] Satter argues the State's evidence and argument at trial indicated a premeditated intent to kill theory, while he was charged and the jury was instructed on a depraved mind theory. He then argues that the instructions "omitted the distinguishing element: that the charged offense could be true *only if* there was an absence of intent to kill."

[¶ 15] Satter claims the absence of intent to kill is an affirmative element of the depraved mind murder, citing *State v. Lyerla*, 424 N.W.2d 908 (S.D.1988) *cert. denied*, 488 U.S. 999, 109 S.Ct. 774, 102 L.Ed.2d 767 (1989). *Lyerla* held attempted second degree murder does not exist. It did not distinguish between or even discuss premeditated and depraved mind murder. Satter also cites *State v. Burtzlaff*, 493 N.W.2d 1 (S.D. 1992). *Burtzlaff* discusses first-degree manslaughter, which "requires the perpetrator to be without design to effect death." *Burtzlaff*, 493 N.W.2d at 4. Satter points out what he believes to be the court's discussion of an "element" of lack of premeditated intent to kill. However, the element the court discussed in *Burtzlaff* is one of four ways

(the 1995 revision added a fifth) a defendant could commit first-degree manslaughter: "Without a design to effect death, but by means of a dangerous weapon." SDCL 22–16–15(3). It was not another element for the state to prove.[2] Thus, Satter has not provided authority for his interpretation of the statute.

[¶ 16] The State argues the absence of intent to kill is a negative element, which the State need not prove. The Wyoming Supreme Court considered a similar issue:

First Cheatham argues that there was no evidence that he acted without malice, and, since one element of the crime of involuntary manslaughter is the absence of malice, the state has failed to prove a violation of the statute....

Cheatham's assumption that an essential element of the crime of involuntary manslaughter is the absence of malice is not well founded. Those words in the statute were adopted to distinguish involuntary manslaughter from the more serious crimes of homicide. They do not have the effect of making absence of malice an essential element of the crime.

*Cheatham v. State*, 719 P.2d 612, 622 (Wyo. 1986). We agree with this analysis. Similarly, the language "although without any premeditated design" in our depraved mind statute is used simply to distinguish premeditated murder.

[¶ 17] While the intent to kill is the distinguishing factor between premeditated murder and depraved mind murder, the absence of intent to kill does not operate in the reverse. Satter has not cited any cases which support his claim that the charged offense could be true *only if* there was an absence of intent to kill.

[¶ 18] Satter claims the State's evidence was insufficient because it showed only intent to kill, not depraved mind murder. He ar-

2. The language of the depraved mind statute does not support Satter's claim either.

The language of the depraved mind statute includes "although without any premeditated design." "Although" is defined as "granting or supposing that; even if; even though; in spite of the fact that ..." Webster's Third New International Dictionary p. 63 (1976). The

plain language of the statute shows Satter's interpretation is incorrect. The legislature inserted the word "although" so a defendant could be convicted of murder *even though* there was no evidence of premeditation, not *because* there was evidence of no premeditation.

gues that this court holds the two categories of murder "entirely separate and distinct" and claims it is "constitutional error to submit 'depraved mind' murder to the jury when only 'premeditated murder' is alleged," citing *State v. Lohnes*, 324 N.W.2d 409 (S.D.1982) *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1232, 75 L.Ed.2d 466 (1983) and *State v. Reddington*, 7 S.D. 368, 64 N.W. 170 (1895).

[¶ 19] *Lohnes* and *Reddington* held that the defendants were denied their constitutional rights to know the nature of accusations against them. S.D.Const.Art. VI, § 7. Both *Lohnes* and *Reddington* differ from this situation, as those defendants were charged with first-degree murder or premeditated murder and the jury was instructed on both first-degree murder and second-degree murder. *Lohnes*, 324 N.W.2d at 412; *Reddington*, 7 S.D. at 380–81, 64 N.W. at 174. Here, Satter was informed that he was being charged with depraved mind murder. The jury was instructed and Satter was convicted of same. A plain reading of the statute and the cases cited by Satter reveals no error in charging or instructing on depraved mind murder.

[¶ 20] Satter further claims there is insufficient evidence to convict him of depraved mind murder because the State's evidence showed only intent to kill, and not the legal standards for depraved mind murder. The State argues this issue was not preserved for appeal because he did not cite authority for his position. "[F]ailure to cite authority violates SDCL 15–26A–60(6) and constitutes a waiver of that issue." *State v. Phillips*, 489 N.W.2d 613, 616 (S.D.1992) (citations omitted). The State also argues the evidence supports Satter's conviction for depraved mind murder because two of the State's witnesses and Satter testified he did not premeditate the murders.

[¶ 21] In his reply brief, Satter expands and alters his argument for this issue. He claims the evidence does not support a conviction for depraved mind murder because " 'depraved mind' murder is exemplified by (in current example) the Oklahoma City bomber, where the actor's actions are not directed at anyone in particular." The Washington Supreme Court discussed this issue in *State v. Mitchell*, 29 Wash.2d 468, 188 P.2d 88 (1947). The *Mitchell* court discussed the New York Supreme Court's decision in *Darry v. People*, 10 N.Y. 120 (1854).

> The [statute] embraced only those cases where the act resulting in death was such as to imperil the lives of many persons, without being aimed at any one in particular; and therefore did not include a case of killing without premeditated design to effect death, though perpetrated by such acts as were imminently dangerous to the person killed, and though evincing a depraved mind, regardless of the life of the deceased.

*Mitchell*, 188 P.2d at 92. The *Mitchell* court stated:

> "This provision of the statute applies to homicides committed from 'universal malice,' as it is called in the books; as by purposely discharging a loaded gun into a crowd of people, or wrecking a passenger train on a railroad, whereby one or more persons are killed; but *ex vi terminorum*, it excludes a homicide which is committed by a blow or injury intentionally aimed at and inflicted on the person killed, though such homicide may be murder in the first degree under another clause of the statute. Hence, where the homicide was committed by a blow with an oaken stick, intentionally aimed at the deceased, it is error to instruct the jury, 'that if the homicide was perpetrated by an act greatly dangerous to the life of the deceased, and evidenced a depraved mind regardless of human life, it would be murder in the first degree.' "

*Id.* 188 P.2d at 93–94 (citation omitted). This interpretation was also applied in *Massie v. State*, 553 P.2d 186, 191–92 (Okla.Crim.App. 1976) and *State v. Anderson*, 94 Wash.2d 176, 616 P.2d 612, 617–620 (1980) *cert. denied*, 459 U.S. 842, 103 S.Ct. 93, 74 L.Ed.2d 85.

[¶ 22] *Mitchell* quoted *State v. Russell*, 106 Utah 116, 145 P.2d 1003, 1008 (1944), which stated:

> "This requires an act which is, at least potentially, dangerous to other persons and not directed against any one in particular. Such an act is more dastardly than where only one person can be endangered, even though only one is affected thereby.

No doubt this was considered in making this murder in the first degree without a specific intention to kill."

*Russell,* 145 P.2d at 1009. The South Dakota legislative sentencing scheme did not distinguish between degrees of murder in 1972. Under the 1972 statutes, depraved mind murder was one of three forms of murder. "Every person convicted of murder shall be sentenced to death or to hard labor in the state penitentiary for life." SDCL 22–16–12 (1972 version). Currently, depraved mind murder is classified as murder in the second degree. "Murder in the first degree is a Class A felony. Murder in the second degree is a Class B felony." SDCL 22–16–12. Class A felonies are punishable by death or life imprisonment and Class B felonies by life imprisonment. SDCL 22–6–1. Thus, a distinction in punishment is now made between premeditated and felony murder (murder in the first degree) and depraved mind murder (murder in the second degree).

[¶ 23] The courts in *Mitchell, Massie,* and *Anderson* reversed convictions. The *Mitchell* court stated:

> Since, upon the evidence, appellant could not properly have been convicted under [the depraved mind subdivision of the murder statute], the charge under that subdivision should have been withdrawn. For the same reason, we consider the submission of the case on that charge and the giving of instructions on that issue prejudicially erroneous, in that the jury was thereby authorized to return a verdict of guilty upon a charge not properly in the case.

*Mitchell,* 188 P.2d at 96–97.

[¶ 24] The language of the 1972 depraved mind murder statute is substantially the same as the second degree murder statute today. When asked to distinguish between first-degree manslaughter and second-degree murder, this court stated: " 'The crucial distinction between second-degree murder and manslaughter in the first degree is that the former requires a 'depraved mind' as an element of the crime, while the latter does

not.' " *State v. Arguello,* 502 N.W.2d 548, 555 (S.D.1993) (quoting *State v. Primeaux,* 328 N.W.2d 256, 258 (S.D.1982 (citation omitted)). There was no discussion that the depraved mind statute excluded acts aimed at specific individuals. This court has affirmed convictions for second-degree murder where an individual was bludgeoned to death by two men. (*State v. Tapio,* 459 N.W.2d 406, 408 (S.D.1990)) and where an individual was stabbed to death by another (*Primeaux,* 328 N.W.2d at 257). Thus, this court has made no distinction that a charge of second degree murder (or depraved mind murder) is not available where one individual kills another.

### [¶ 25] 2. Was Satter's written statement properly admitted?

[¶ 26] On April 11, 1973, Satter failed a polygraph examination and agreed to waive his *Miranda* rights and make a statement. Typewritten statements admitting the killings were signed by Satter on April 11 and 12, 1973. The statements were "given with the understanding that a polygraph test will be offered to me at a future date. Also that the State will not contest or object to the polygraph test being offered as evidence." *Satter IV,* 458 N.W.2d at 769. This court addressed the statements in *Satter IV,* and held them involuntary because "[T]he failure of the State to fulfill its promise [to offer a polygraph test] invalidate[d] Satter's waiver of his rights and ma[de] his statement involuntary." *Id.* (citing *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)). However, this court stated, "were the State to fulfill its promise at this date, we would find that Satter's April 11th and 12th statements were voluntary and admissible." *Id.*

[¶ 27] Satter filed a motion to suppress the statements on April 20, 1993 claiming the State's promises could not be fulfilled. He argued it would be "impossible to administer a meaningful polygraph examination." He called an expert witness in polygraph examinations to discuss problems in testing which make results unreliable.[3]

---

3. The expert was asked:
   Q: In your professional opinion, . . . would it have been possible on April 12th of 1973 to devise a relevant question on the . . . issue of

whether Mr. Satter was justified in taking another's life?
A: Well, you can certainly formulate a question and you can conclude it on a polygraph

[¶ 28] Following the suppression hearing, the trial court issued a memorandum decision based on his reading of the holding in *Satter IV*, which stated: "The Supreme Court has adopted the rule that results of a polygraph examination taken upon stipulation are admissible." The trial court considered Satter's claim of unreliability irrelevant. The trial court stated, "[t]he stipulation rule is not rooted in a finding that the polygraph is infallible. To the contrary, the polygraph's shortcomings are widely known."

[¶ 29] The trial court also considered that a defendant has the right to waive protection provided by *Miranda*, and should not be prevented from waiving the protection of the rule on inadmissibility of polygraph examinations.[4]

[¶ 30] The trial court ruled the statements admissible if the State offered a polygraph examination to Satter, whether Satter took the examination or not. The State offered Satter a polygraph examination on April 3, 1991. Following the suppression hearing and the trial court's ruling, the State renewed its offer but Satter did not take the examination.

 [¶ 31] Satter now argues the State cannot "meaningfully" comply with its promise. The expert's opinion was that a polygraph examination would be unreliable in this case, whether given in 1973 or in 1993. However, neither the State's stipulation nor this court's 1990 ruling promised Satter reliable or favorable results. The trial court did not err in ruling the State could fulfill its promise and the statements were properly admitted.

[¶ 32] Affirmed.

[¶ 33] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

---

test, but in my view there's no reason to think that you get an accurate result and a lot of reason to think you'd get an inaccurate result ... the polygraph is no magical instrument that's going to be able to probe into a person's inner psyche and fish out the truth[.]

Q: Would it be any better than flipping a coin?

A: I don't think it would be[.]

Q: That would have been true on April 12th of 1973, in your professional judgment?

A: That would have been true then.

Q: What about today? ... Can you think of any polygrapher that you could call up and work with to devise a relevant question ... that could determine whether Mr. Satter was indeed ... acting in self-defense[?]

A: I don't think so, not in a way that would produce a result that we'd have any reason to believe was accurate.

4. The trial court also adopted the "conditions and limitations" on the rule of admissibility of polygraph tests from *State v. Ross*, 7 Wash.App. 62, 497 P.2d 1343 (1972), as follows:

(1) That the prosecuting attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

a. the examiner's qualifications and training;

b. the conditions under which the test was administered;

c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant [was or] was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given.

*Ross*, 497 P.2d at 1347–48 (citing *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962)).