

This opinion was filed for record

at ____8:00 a.m.____ on Jan 18, 2018

Shon L. Carl

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

In the Matter of the Personal Restraint of ) No. 92412-1
)
EDUARDO SANDOVAL, ) En Banc
)
        Petitioner. ) Filed ____JAN 18 2018____
)
_____ )

MADSEN, J.—In this personal restraint petition (PRP) concerning complicity

charges based on murder by extreme indifference, we reject petitioner Eduardo

Sandoval's contentions that accomplice liability for murder by extreme indifference and

conspiracy to commit murder by extreme indifference are not cognizable offenses. We

further hold that the trial court erred in failing to give a requested lesser included

instruction on manslaughter, and on this limited basis we grant the PRP and remand for

further proceedings consistent with this opinion.

## FACTS

Sandoval is a member of the Eastside Lokotes Sureños (ELS) gang in Tacoma.

On February 7, 2010, ELS members, in a stolen van, pulled up to a car and fired no less

than 12 gunshots from at least two firearms into the passenger door of the car. The

driver, Camilla Love, was hit three times and died from her injuries. The passenger,

Joshua Love, was hit two times but survived. The van occupants targeted the Loves on the mistaken belief that Joshua Love was a Pirus gang member. At the time, the van occupants were seeking out rival Pirus members to retaliate for a February 5, 2010 drive-by shooting targeting ELS members, including Sandoval. The ELS's leader, Juan Zuniga, believed Pirus members were responsible for the earlier attack.

On February 6, 2010, Zuniga held a meeting with fellow ELS members to plan retribution for the February 5, 2010 shooting. The plan was for ELS members to use a van stolen by ELS associates to attack Pirus members and then destroy the van. ELS members not in the van would patrol designated areas in separate vehicles in search of Pirus members, and be on the lookout for police. Sandoval attended the meeting.

The next day, on February 7, 2010, ELS members worked out the plan particulars and roles (e.g., shooters, van driver, and patrol/lookout) and converged that evening to carry out the plan. Sandoval and Antonio Gonzales were present at this later meeting, as was the van, which was stolen the prior evening by other ELS associates.

Sandoval rode to the February 7, 2010, meeting with Gonzales, who was assigned to patrol the ELS's southernmost territorial boundary. Sandoval volunteered to go with Gonzales, who brought his two young children with him. By riding with Gonzales, Sandoval purportedly could appear to cooperate in the plan without taking an active role. Gonzales also testified that he did not intend to complete his assigned task.

When the group left this final meeting, Gonzales and Sandoval first drove to a park outside of their patrol area, put on a video for Gonzales' children, and smoked

marijuana. After 30 minutes, the occupants of the stolen van spotted them and advised them to carry out their assigned task. The pair then proceeded to the lookout area. They spotted a police car parked at a bank and communicated the police location to the van occupants.

Later that evening, Zuniga called to instruct them to go home, as the shooting had since transpired. Two weeks later, at Zuniga's instruction, Sandoval and another ELS member took the alleged van driver, Jarod Messer, to Mexico because someone matching his description had been identified as a possible suspect in the shooting.

Love's shooting went unsolved for several months. Then, in May 2010, Gonzales and two other ELS members murdered ELS leader Zuniga. When arrested for Zuniga's murder, these three ELS members volunteered information about Love's killing. That information led to the arrest of Sandoval and other ELS members involved in the Love shooting.[1] The ELS members involved in the Zuniga killing also agreed to testify on behalf of the State against the four ELS members and associates arrested and charged in Love's killing in exchange for significant sentence reductions in the Zuniga killing and no murder charges in Love's shooting.

Sandoval was arrested in September 2010. The State ultimately charged Sandoval with three counts: first degree murder (by extreme indifference) of Camilla Love (count I), first degree assault of Joshua Love (count 2), and conspiracy to commit first degree

---

[1] These included Time Time (van stealer); Dean Salavea (van stealer); Saul Mex (one of two trigger men); Messer (van driver); and there was an arrest warrant for Santiago Mederos (the other trigger man), who remained at large.

3

murder (count 3). The other ELS members involved in the shooting[2] were similarly charged. They were tried along with Sandoval in the same proceeding, but pleaded guilty after the prosecution rested in exchange for reduced charges. Only Sandoval took his case to the jury.

Following closing arguments, Sandoval's counsel sought to include jury instructions for the lesser included charges of accomplice to first degree and second degree manslaughter if, "after full and careful deliberation on [the count I murder] charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty." Clerk's Papers (CP) at 254 (Instr. 5). The court denied the request.[3]

During deliberations, the jury asked the court whether it could use the instruction defining first degree murder (as conduct creating a grave risk of death and causing death under circumstances manifesting an extreme indifference to human life) when considering the instruction defining conspiracy. After conferring with counsel, the court answered affirmatively. The jury ultimately convicted Sandoval as charged. The court then entered a judgment and sentence consistent with the second amended information.

---

[2] Time, Salavea, Messer, and Mex.

[3] The trial court did include a general instruction on accomplice liability. *See* CP at 327 (Instr. 6).

The State recommended Sandoval receive a total sentence of 724 months for all three crimes. The court sentenced Sandoval to a total sentence of 904 months of confinement.[4] The ELS members who pleaded guilty received reduced charges.[5]

Sandoval appealed, arguing that the evidence presented at trial was insufficient to support his convictions. With his direct appeal, Sandoval also filed a pro se petition for a writ of habeas corpus, which was transferred to the Court of Appeals for consideration as a PRP.[6] The Court of Appeals consolidated Sandoval's direct review with his PRP and issued an unpublished decision on March 18, 2014, affirming the trial court's judgment and sentence and dismissing Sandoval's initial PRP.[7] Sandoval did not petition for review of Division Two's decision, and the Court of Appeals mandated the case on May 16, 2014.

---

[4] Sandoval's sentence reflected the maximum standard range available under the sentencing guidelines of 421 months for murder, 183 months for assault, and 300 months for conspiracy to commit murder, all to be served consecutively.

[5] Mex, a shooter, received 421 months for murder; Messer, the van driver, 421 months for murder and 34 months for unlawful possession of a firearm; and Time and Salavea, the van stealers, 150 and 130 months, respectively, for the crime of leading organized crime. Gonzales, whom Sandoval accompanied the evening of Love's murder, was not charged for his role. Instead, he received a 45 month sentence solely for his role in Zuniga's murder.

[6] In the writ, Sandoval asserted that (1) his arrest violated the Fourth Amendment, (2) his interrogation violated the Fifth Amendment, and (3) the State lacked authority to prosecute him. U.S. CONST. amends IV, V.

[7] The Court of Appeals held in part that "the evidence is sufficient to support Sandoval's conviction for conspiracy to commit first degree murder by extreme indifference." *State v. Sandoval*, No. 43039-8-II, slip op. at 9 (Wash. Ct. App. Mar. 19, 2014) (unpublished), http://www.courts.wa.gov/opinions.

On April 17, 2015, Sandoval filed his current PRP with the Court of Appeals, which transferred the PRP to this court.[8] We retained the petition for consideration on the merits.

## ANALYSIS

### A. Standard of Review

An unlawfully restrained petitioner may file a PRP. RAP 16.4. Restraint is unlawful when, among other things, "[t]he conviction was obtained or the sentence or other order . . . was imposed or entered in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(2). Successive petitions based on similar grounds or raising a new issue will not be heard without a showing of good cause. *In re Pers. Restraint of VanDelft*, 158 Wn.2d 731, 738, 147 P.3d 573 (2006), *overruled on other grounds as recognized in State v. Vance*, 168 Wn.2d 754, 762-63, 230 P.3d 1055 (2010). And while the Court of Appeals is barred from hearing successive PRPs on new grounds, unless the petitioner can show good cause why he or she failed to raise the issues previously, this court is not so barred.[9] RCW 10.73.140; *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 362-63, 256 P.3d 277 (2011).

---

[8] Because this is a successive PRP based on new grounds without good cause why the issues raised were not raised in Sandoval's previous PRP, the Court of Appeals lacked jurisdiction to rule and transferred the PRP to this court. RCW 10.73.140.

[9] As noted, in his prior pro se PRP, Sandoval claimed unlawful arrest, unlawful interrogation, and a lack of authority to prosecute. *Sandoval*, slip op. at 9. Sandoval's current PRP raises different issues from his prior PRP, claiming his incarceration is the result of trial court errors, prosecutorial misconduct, ineffective assistance of counsel, and disproportionate sentencing.

Further, a PRP is not timely if filed "more than one year after the judgment becomes final." RCW 10.73.090(1). A judgment becomes final, among other things, when "an appellate court issues its mandate disposing of a timely direct appeal from the conviction." RCW 10.73.090(3)(b). The Court of Appeals mandated its decision on Sandoval's direct appeal on May 16, 2014, and Sandoval filed the current PRP April 17, 2015. Accordingly, his current PRP is timely.

Also, frivolous PRPs need not be considered. RAP 16.11(b). A PRP "is frivolous where it fails to present an arguable basis for collateral relief either in law or in fact, given the constraints of the [PRP] vehicle." *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 686-87, 363 P.3d 577 (2015) (plurality opinion). Sandoval's PRP is not frivolous. He provides an arguable basis in law for at least one of his claims, as discussed *infra*.

PRPs must demonstrate error and, if the error is constitutional, that the petitioner is "actually and substantially prejudiced." *In re Pers. Restraint of Coats*, 173 Wn.2d 123, 132, 267 P.3d 324 (2011). If not constitutional, the PRP must show the error represents a "fundamental defect . . . that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). This heightened standard of review applies to all issues for which a petitioner had a previous opportunity for judicial review and is designed to promote finality. *Coats*, 173 Wn.2d at 132.

B. Instruction on Lesser Included Offense of Manslaughter

Relying on *State v. Henderson*, 182 Wn.2d 734, 344 P.3d 1207 (2015), Sandoval contends that the trial court improperly denied his request for a jury instruction on the lesser included offense of manslaughter. We agree.

*Henderson* controls this issue. "A defendant is entitled to an instruction on a lesser included offense when (1) each of the elements of the lesser offense is a necessary element of the charged offense and (2) the evidence in the case supports an inference that the lesser crime was committed." *Id.* at 742 (citing *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978)). As in *Henderson*, "the first prong of the *Workman* rule is met" here because "the elements of first degree manslaughter are necessary elements of first degree murder by extreme indifference." *Id.* Thus, as in *Henderson*, the only issue in the present case is "whether the evidence supports an inference that the lesser crime was committed rather than the greater crime." *Id.*

In *Henderson*, we reiterated that "[a] jury must be allowed to consider a lesser included offense if the evidence, when viewed in the light most favorable to the defendant, raises an inference that the defendant committed the lesser crime instead of the greater crime." *Id.* at 736 (citing *State v. Fernandez-Medina*, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000)). "If a jury could rationally find a defendant guilty of the lesser offense and not the greater offense, the jury must be instructed on the lesser offense." *Id.* (citing *Fernandez-Medina*, 141 Wn.2d at 456).

8

The facts in *Henderson* are analogous to the facts at issue here. In *Henderson*, a defendant was charged with murder by extreme indifference based on evidence that he fired a gun repeatedly (six times) at an occupied dwelling where people were standing outside. *Id.* at 739. In the present case, a defendant was charged with murder by extreme indifference based on evidence that he fired a gun repeatedly (12 times) into an occupied car.

In *Henderson*, we held that the trial court erred in denying the defendant his requested instruction on the lesser included offense of first degree manslaughter. Despite the great similarity between the charged crime of murder by extreme indifference and homicide by (reckless) manslaughter, it was still possible to say the evidence supported an inference that the defendant committed only the lesser (reckless) offense to the exclusion of the greater (extreme indifference) offence. *Id.* at 744. "Viewing this evidence in the light most favorable to Henderson, a jury could have rationally concluded that Henderson acted with disregard for a substantial risk of homicide rather than an extreme indifference that caused a grave risk of death." *Id.* at 745. Noting that the court "must view the evidence in the light most favorable to [the defendant requesting the instruction]," we opined that "[i]n that light, we certainly cannot say that *no jury* could rationally find first degree manslaughter instead of first degree murder by extreme indifference." *Id.* at 746. Accordingly, the defendant was "entitled to a jury instruction on first degree manslaughter." *Id.*

Here, the facts of the *Henderson* homicide are comparable in all relevant respects to the facts of the homicide in the present case: the shooter aimed a gun toward an occupied structure, fired repeatedly, and unsurprisingly someone was killed. Further, the victim in *Henderson* was standing outside the house and thus was more vulnerable than the victim in the present case, who was inside the car. Accordingly, the manslaughter instruction is available in Sandoval's case because gross negligence is even more plausible here. Similarly, the fact that Henderson was charged as a principal, reflecting that he was physically at the scene, personally pulled the trigger, and was thus more overtly personally culpable than Sandoval, who was not present at the shooting but was charged as an absent accomplice, additionally persuades that the manslaughter instruction should be available here. Restated, Sandoval's accomplice status makes his personal, direct culpability for the greater crime even more attenuated than was the defendant's culpability as a principal for the greater crime in *Henderson*. Following *Henderson*, we hold that Sandoval was entitled to an instruction on the lesser included offense of first degree manslaughter. We grant Sandoval's PRP on this issue, reverse his conviction on count I, and remand for further proceedings consistent with this opinion.[10] We find Sandoval's remaining contentions unavailing.

---

[10] The dissent chides us for granting Sandoval's PRP on the instructional issue, contending that because it is possible that the jury might have reached the same conclusion even if properly instructed, Sandoval's PRP has failed to make the required showing of a fundamental defect in his trial. But under the facts of this case, the limited PRP relief we grant is appropriate. As discussed above, our recent decision in *Henderson* clearly establishes that Sandoval was entitled to an instruction on the lesser included offense of first degree manslaughter, which he requested at trial. As in *Henderson*, the trial court erred in not giving that instruction. *Henderson* directs that under the circumstances here, "the jury *must* be instructed on the lesser offense." 182

## C. Cautionary Jury Instruction on Accomplice Testimony

Sandoval next contends that the trial court erred in refusing his request to give the following pattern jury instruction:

> Testimony of an accomplice, given on behalf of the State, should be subjected to careful examination in the light of other evidence in the case, and should be acted upon with great caution. You should not find the defendant guilty upon such testimony alone unless, after carefully considering the testimony, you are satisfied beyond a reasonable doubt of its truth.

CP at 253 (Instr. 4); 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 6.05, at 197 (4th ed. 2016); *see also* 32 Verbatim Tr. of Proceedings (VTP) (Jan. 10, 2012) at 3673-74. A trial court's denial of this instruction is error where the State does not "substantially corroborate[]" the accomplice testimony through "testimonial, documentary or circumstantial evidence." *State v. Harris*, 102 Wn.2d 148, 155, 685 P.2d 584 (1984), *overruled on other grounds by State v. McKinsey*, 116 Wn.2d 911, 914, 810 P.2d 907 (1991).

Sandoval asserts accomplice testimony was not substantially corroborated by the State. We disagree. The trial court found that given the testimony presented at trial, there was substantial corroborating evidence and the State was not relying solely on the accomplice's testimony. The court did so after reviewing recorded statements Sandoval made to police (that were later played for the jury) describing the general characteristics of gang life; testimony corroborating Sandoval's attendance at the planning meetings, his

---

Wn.2d at 736 (emphasis added). *Henderson*, which controls this issue, was not decided until after the mandate issued in Sandoval's direct appeal. Under these circumstances, granting Sandoval's PRP on this issue is warranted.

knowledge of the resulting plan, and his attempt to assist Gonzales on his assigned surveillance mission; physical evidence provided by the recovered stolen van; and testimony by witnesses to the shooting itself. Accordingly, the trial court did not err in determining that the State met its burden. This issue is meritless.

### D. Cognizability of Counts I and III

Sandoval's PRP also contends that the trial court erred in entering judgment against him on count I and count III, respectively, because accomplice liability for murder by extreme indifference and conspiracy to commit murder by extreme indifference are not cognizable offenses. We disagree. As noted, the criminal plan here was to retaliate for a gang shooting. That plan involved stealing a van for the shooters to use and cruising around to locate rival gang members with the aid of other gang members in another car, all with the purpose to retaliate in kind for the previous shooting. The outcome here turns on the nature of the plan and the conduct of the participants that resulted in the retaliatory (though misdirected) shooting that killed Camilla Love.

### 1. Accomplice Liability

"Accomplice liability" is defined in RCW 9A.08.020(3)(a)(ii), which provides in relevant part that a person is an accomplice of another person in the commission of a crime if *with knowledge* that it will promote or facilitate the commission of *the* crime, he or she *aids* or agrees to aid such other person in *planning* or *committing* it. Here, Sandoval clearly *aided* in the *planning* of *the* crime—the shooting that resulted in death. He rode around in the car, looking for rival gang members, and reported the location of

police to his compatriots in the van, thereby facilitating the shooting. As to Sandoval's mental state, it cannot feasibly be argued that he was not aware of the purpose (retaliation) or likely outcome of the enterprise (i.e., that shooting into an occupied car may very well result in death).

"Washington's culpability statute provides that a person has actual knowledge when 'he or she has information which would lead a reasonable person in the same situation to believe' that he was promoting or facilitating *the* crime eventually charged. RCW 9A.08.010(1)(b)(ii)." *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015) (emphasis added); *see also* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.2(e) at 353 (2d ed. 2003) ("giving assistance or encouragement to one it is known will thereby engage in conduct dangerous to life should suffice for accomplice liability as to crimes defined in terms of recklessness or negligence").[11] Here, Sandoval's actions of aiding in the shooting under the circumstances make accomplice liability properly available under the facts presented, even though the crime is not a specific intent crime and Sandoval, as an accomplice, had no part in the actual shooting.

### 2. Conspiracy

Turning to the conspiracy charge, we find a person is guilty of criminal conspiracy when, *with intent* that *conduct constituting a crime be performed*, he or she agrees with one or more persons to engage in or cause the performance of such conduct, and any one

---

[11] *See State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000) ("in order for one to be deemed an accomplice, that individual must have acted with knowledge that he or she was promoting or facilitating *the* crime for which that individual was eventually charged").

of them takes a substantial step in pursuance of such agreement. *See* RCW 9A.28.040(1). The underlying crime at issue here is murder by extreme indifference and is defined in RCW 9A.32.030(1)(b), which provides that a person is guilty of murder in the first degree when under circumstances manifesting an extreme indifference to human life, he or she *engages in conduct that creates a grave risk of death to any person* and thereby causes the death of a person. Sandoval cites *State v. Borner*, 2013 ND 141, 836 N.W.2d 383, 391, which holds that conspiracy to commit extreme indifference murder is not a cognizable offense, reasoning that conspiracy to commit unintentional murder creates a logical inconsistency[12] because one cannot agree in advance to accomplish an unintended result; accordingly, conspiracy is a specific intent crime requiring intent to agree and intent to achieve a particular criminal result. We disagree with this articulation of the requirements of conspiracy. In our view, the conspiracy inquiry's focus here is more properly placed on Sandoval's agreement to engage in conduct that creates a grave risk of death to any person, whether or not death actually occurs (a conspiracy does not require the crime be completed). It was Sandoval's agreement to participate in this criminal

---

[12] Purported logical inconsistencies aside, the legislature is entitled to criminalize conduct as it sees fit within constitutional bounds. *See, e.g., State v. Freeman*, 153 Wn.2d 765, 771, 108 P.3d 753 (2005) ("legislature has the power to define offenses and set punishments"; legislature has the power to criminalize every step leading to a greater crime, and the crime itself (citing *Garrett v. United States*, 471 U.S. 773, 779, 105 S. Ct. 2407, 85 L.Ed.2d 764 (1985))); *cf. Albrecht v. United States*, 273 U.S. 1, 11, 47 S. Ct. 250, 71 L. Ed. 505 (1927) ("There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and punishing also the completed transaction.").

scheme and his culpable conduct in furtherance of the scheme that the conspiracy charge seeks to deter.

As this court has explained, "[T]he conspiracy statute punishes the act of agreeing to undertake a criminal scheme," it is an "inchoate crime[] that target[s] preparatory conduct without regard to whether the contemplated crime actually occurs." *State v. Jensen*, 164 Wn.2d 943, 950, 195 P.3d 512 (2008); *see also* Ira P. Robbins, *Double Inchoate Crimes*, 26 HARV. J. ON LEGIS. 1, 89 (1989) ("The essence of conspiracy is the communication of a criminal scheme by one party to another to gain the other's support. The success or failure of the target crime is irrelevant in determining conspiratorial liability." (footnote omitted)). "A conspiracy has been defined as '["]a partnership in criminal purposes. The gist of the crime is the confederation or combination of minds.["]'" *State v. Dent*, 123 Wn.2d 467, 475, 869 P.2d 392 (1994) (quoting *State v. Casarez-Gastelum*, 48 Wn. App. 112, 116, 738 P.2d 303 (1987) (quoting *Marino v. United States*, 91 F.2d 691, 693-98 (9th Cir. 1937), *cert. denied*, 302 U.S. 764)).

> "[C]onspiracy focuses on the additional dangers inherent in group activity. In theory, once an individual reaches an agreement with one or more persons to perform an unlawful act, it becomes more likely that the individual will feel a greater commitment to carry out his original intent, providing a heightened group danger.
> *As an inchoate crime, conspiracy allows law-enforcement officials to intervene at a stage far earlier than attempt does.* . . . To obtain a conspiracy conviction, . . . the prosecutor need only prove that the conspirators agreed to undertake a criminal scheme or, at most, that they took an overt step in pursuance of the conspiracy.

*Id.* at 476 (first alteration in original) (quoting Robbins, *supra*, at 27-29).

Here, as noted, under RCW 9A.32.030(1)(b) a person is guilty of murder by extreme indifference where a person *engages in conduct that creates a grave risk of death* to any person, and death results. The culpable conduct here is the volitional conduct creating a grave risk. In other words, while the presence or absence of death drives the particular charging decision,[13] the gravamen of the offense, the volitional conduct warranting sanction, remains the same whether or not death results. Thus, in our view, the conspiracy to commit murder by extreme indifference requires that the *conduct* be intended, that is, there must be an agreement (express or implied) to engage in conduct creating a grave risk, but the result of the conduct—death—need not be intended.

While case law varies concerning the availability of conspiracy in this context, we believe the better reasoned approach focuses defendant's criminal liability for conspiracy in this circumstance on defendant's agreement in light of the intended culpable conduct to be performed. This approach—focusing on defendant's conduct rather than the end result when addressing conspiracy—finds support in case law such as *United States v. Feola*, 420 U.S. 671, 95 S. Ct. 1255, 43 L. Ed. 2d 541 (1975). There, in affirming a conspiracy conviction, the United States Supreme Court stated:

> Our decisions establish that in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself. Respondent Feola urges upon us the proposition that the Government must show a degree of criminal intent in

---

[13] The fact of death informs the charging decision. If death results from the volitional conduct creating a grave risk (e.g., shooting a gun into a car), the defendant may be charged as here with first degree murder under RCW 9A.32.030(1)(b). Where the same conduct does not result in death, defendant is still liable for the conduct but may be more properly chargeable for drive-by shooting under RCW 9A.36.045.

16

the conspiracy count *greater* than is necessary to convict for the substantive offense; he urges that even though it is not necessary to show that he was aware of the official identity of his assaulted victims in order to find him guilty of assaulting federal officers, in violation of 18 U. S. C. § 111, the Government nonetheless must show that he was aware that his intended victims were undercover agents, if it is successfully to prosecute him for conspiring to assault federal agents. And the Court of Appeals held that the trial court's failure to charge the jury to this effect constituted plain error.

*Id.* at 686-87 (emphasis added) (citations omitted). In *Feola*, the underlying offense, assaulting federal officers (undercover narcotics agents) in the performance of their official duties, required intentional assault but not the intent to assault federal officers. *Id.* at 674, 694-95. Thus, conspiracy to assault federal officers required only the agreement to the conduct of assaulting certain individuals but did not require intent of the consequences that it was federal officers who were assaulted. As the *Feola* court reasoned, the crime of conspiracy does not require proof of a greater intent than is necessary to convict for the substantive crime. In murder by extreme indifference, it is the conduct that must be intended, not the result of the conduct.

Similarly, in *United States v. Parker*, 165 F. Supp. 2d 431 (W.D.N.Y. 2001), the court denied dismissal of a charge of conspiracy to steal government property when the defendants conspired to perform the act of stealing even though they neither knew the property belonged to the government nor intended the consequence of stealing government property. Relying on *Feola*, the court explained, "Defendants' guilt on this [conspiracy] count will turn on whether they conspired to steal property which may have been owned by the government regardless of whether the property in fact belonged to the

17

government." *Id.* at 462. Again, it is the conduct that must be intended, not the result of the conduct.

In *United States v. Brown*, 49 F.3d 1162 (6th Cir. 1995), the Sixth Circuit held that there can be conspiracy to violate an individual's civil rights when defendants intended the conduct but did not specifically intend to violate civil rights. Citing to *United States v. O'Dell*, 462 F.2d 224, 232 n.10 (6th Cir. 1972), the *Brown* court stated, "The United States need not prove that the defendant actually knew it was a constitutional right being conspired against or violated." 49 F.3d at 1165. The *O'Dell* court had observed, "'The fact that the defendants may not have been thinking in constitutional terms is not material. . . .' It is enough if Appellants can be shown to have acted in a manner which was 'in reckless disregard of constitutional prohibitions or guarantees." 462 F.2d at 232 n.10 (quoting *Screws v. United States*, 325 U.S. 91, 106, 65 S. Ct. 1031, 89 L. Ed. 1495 (1945)). Again, the focus of the conspiracy inquiry is the agreement and the ensuing conduct rather than the result of that conduct.

Other decisions are in accord with the notion that conspiracy is available here. *See Commonwealth v. Fortune*, 305 Pa. Super. 441, 451 A.2d 729 (1982) (affirming conviction for conspiracy to commit second degree murder (felony murder)); *State v. Phillips*, 489 N.W.2d 613, 616 (S.D. 1992) (acknowledging guilty plea to conspiracy to commit second degree murder (imminently dangerous act evincing a depraved mind)); *People v. La Plant*, 670 P.2d 802, 803 (Colo. App. 1983) (affirming conviction for conspiracy to commit second degree murder (knowingly causing death)); *United States v.*

*Croft*, 124 F.3d 1109, 1122-23 (9th Cir. 1997) (agreeing with the Fifth Circuit case of *United States v. Chagra*, 807 F.2d 398, 401-02 (5th Cir. 1986), that "it is logically possible to conspire to commit second-degree murder").[14]

Finally, in *Chagra*, the Fifth Circuit rejected "the rhetorical flourish that 'one cannot plan an unplanned event'" and noted instead that "[c]onspiracy . . . is a crime independent of the substantive offense that was its object[,] [t]he focus of a conspiracy offense is upon agreement[, and] [t]he inquiry is into defendant's intent at the time of the illegal agreement or conspiracy, and that state of mind can certainly be to impulsively kill." 807 F.2d at 401-02. Applying *Chagra*'s rationale here, Sandoval agreed to assist in a retaliatory gang shooting. The goal (intent) at the time of the agreement was to engage in such shooting, that is, Sandoval agreed (conspired) to engage in conduct that creates a grave risk of death. Substantial steps were taken in pursuance of that agreement: a van was stolen for the shooters to use, and Sandoval and others cruised around in another car to locate potential targets and police and reported this information to the van occupants. Conspiracy liability had already attached at that point whether or not the shooting actually occurred. *See Jensen*, 164 Wn.2d at 950. Further, the intent at the time of the agreement was to engage in the shooting (conduct creating a grave risk); whether or not death would or did result, or whether such result was specifically intended, is superfluous to the conspiracy inquiry. *Cf. Feola*, 420 U.S. at 692 ("it is clear

---

[14] *State v. Beaver*, 148 Wn.2d 338, 60 P.3d 586 (2002), is similar. There, defendant pleaded guilty to conspiracy to commit second degree murder (felony murder premised on assault and resulting death). This court affirmed the conviction, albeit on other grounds.

that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement").

In sum, for the reasons discussed above, we reject Sandoval's contention that conspiracy to commit murder by extreme indifference is not a cognizable crime and thus is unavailable here.

### E. Prosecutorial Misconduct in Closing Argument

Sandoval claims comments made by the prosecutor during rebuttal closing argument constituted misconduct and that this misconduct violated his constitutional right to a fair trial. "To make a successful claim of prosecutor misconduct, the defense must establish that the prosecuting attorney's conduct was *both* improper and prejudicial." *State v. Davis*, 175 Wn.2d 287, 330, 290 P.3d 43 (2012) (emphasis added). "Conduct is improper if, for example, . . . it refers to matters outside the record." *Id.* at 330-31. "To be prejudicial, a substantial likelihood must exist that the misconduct affected the jury's verdict." *Id.* at 331. Further, when a defendant objects to an allegedly improper comment, we evaluate the trial court's ruling for an abuse of discretion. *Id.* "Failure to object to an allegedly improper remark constitutes waiver unless the remark is 'so flagrant and ill-intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *Id.* (quoting *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). While some of the prosecutor's comments were improper, Sandoval fails to demonstrate prejudice.

1. The Prosecutor's "OG" References were Improper But Did Not Prejudice Sandoval

Sandoval asserts the prosecutor's repeated references to Sandoval being an "OG" (original gangster) during his rebuttal closing argument was an improper attempt to embellish Sandoval's culpability to the jury because the inference was not reasonably supported by the record. 17 VTP (Nov. 16, 2011) at 2123. We agree.

Evidence was presented indicating that Sandoval was a longtime ELS member, and Sandoval concedes this. Evidence was also presented that OGs have elevated status. The trial court found this evidence sufficient to support a reasonable inference that Sandoval was an OG. But no one testified that simply being a longtime gang member was sufficient for OG status. Gonzales testified that an OG was one of the older original members of the gang, but he did not identify Sandoval as such, instead naming older gang members who were incarcerated at the time of the Love shooting. Thus, the evidence presented at trial was insufficient for the prosecutor to reasonably infer that Sandoval was an OG. As a result, the OG comments were improper.

But the prejudice generated from such comments is negligible. Sandoval freely admitted he needed to be involved in the attack, attended planning meetings for the attack, and voluntarily assisted Gonzales in searching out a target and keeping an eye on police that evening. Given these admissions, it is not substantially likely that the jury's mistaken belief that Sandoval may have been an OG would have affected the outcome in this case. *Davis*, 175 Wn.2d at 331. This claim has no merit.

2.     The Prosecutor's Racial Comments Were Not Improper

Sandoval further claims that the prosecutor improperly distinguished between the gang status of Asian/Pacific Islanders and Latinos during rebuttal closing argument. Sandoval postulates that the prosecutor was attempting to explain how Sandoval, who is Latino, could be actively involved in the February 7 shooting, even though he seemingly played only a minor role in events that evening. Sandoval asserts this was an improper and prejudicial racial remark. It is improper and a Sixth Amendment violation for a prosecutor to "flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011); U.S. CONST. amend. VI. When racial bias is implicated, the normal prejudicial standard for prosecutorial misconduct is elevated. To avoid a constitutional violation from prosecutorial misconduct based on comments appealing to racial bias, the State must demonstrate that the misconduct did not affect the verdict "beyond a reasonable doubt." *Monday*, 171 Wn.2d at 680

But this heightened standard does not apply every time a prosecutor mentions race. It applies only when a prosecutor mentions race in an effort to appeal to a juror's potential racial bias, i.e., to support assertions based on stereotypes rather than evidence. *See In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 637-38, 316 P.3d 1020 (2014) (heightened standard did not apply when an African American defendant's race was used by the prosecutor as evidence of the defendant's guilt because his race "legitimately tied to the physical and circumstantial evidence pointing to [a defendant of his race] as the

killer"); *see also State v. Emery*, 174 Wn.2d 741, 759, 278 P.3d 653 (2012) (declining to apply *Monday*'s heightened standard to the prosecutor's "seriously wrong" statements because "there is no evidence that the prosecutor was acting in bad faith or attempting to inject bias").

Here, the prosecutor referred to Asian/Pacific Islanders one time and did so to explain the hierarchy of the ELS membership; that is, only Latinos such as Sandoval could be full-fledged members. The statements made in rebuttal, contrasting the race of ELS members and associates, were made to assist the jury in drawing the logical, albeit inferential conclusion that Sandoval was more culpable than his defense team would have the jury believe because as a full-fledged ELS member, Sandoval need not be the trigger man to be actively involved in a shooting perpetrated by the ELS.

Because the heightened standard does not apply, Sandoval, rather than the State, has the burden of demonstrating that the prosecutor's comment regarding the role of Asian/Pacific Islanders was improper and prejudicial, and he fails to do so. The trial court did not err when it held that the prosecutor's statement about gang hierarchy was a reasonable inference based on all the testimony that came out at trial.

It is not substantially likely that any alleged improper comments by the prosecutor prejudiced Sandoval. This claim has no merit.[15]

---

[15] Because we remand for a new trial on count I and find none of Sandoval's other assertions of trial error to be meritorious, we do not reach Sandoval's remaining contentions that his appellate counsel was ineffective and his sentence was disproportionate. We also deny Sandoval's motion to supplement the record, which was passed to the merits.

## CONCLUSION

We hold that the trial court erred in failing to give a requested lesser included instruction on first degree manslaughter, and on this limited basis we grant Eduardo Sandoval's PRP reversing his count I conviction for first degree murder by extreme indifference and remand for further proceedings consistent with this opinion. We further hold that accomplice liability for murder by extreme indifference and conspiracy to commit murder by extreme indifference are cognizable offenses and find none of Sandoval's other assertions meritorious.

No. 92412-1

WE CONCUR:

_Madsen, J._

_Magnum, J._

_Jr. J_

25

*In re Pers. Restraint of Sandoval*, No. 92412-1
Fairhurst, C.J. (concurring/dissenting)

No. 92412-1

FAIRHURST, C.J. (concurring in part/dissenting in part)—I disagree with the majority on two critical issues.[1] First, I disagree with the decision to grant relief for Eduardo Sandoval's count I conviction based on the jury instructions given at trial. Second, I disagree with the majority's conclusion that conspiracy to commit murder by extreme indifference is a cognizable crime. I would reverse Sandoval's count III conspiracy conviction and remand for resentencing while leaving his count I and count II convictions in place. Therefore, I respectfully dissent.

A.    Jury instruction on the lesser included offense for count I

In his personal restraint petition (PRP), Sandoval asserts that the trial court committed error by refusing to provide his requested jury instructions on the lesser

_____

[1] I agree with the majority that no relief should be granted to Eduardo Sandoval for the accomplice testimony jury instructions or the alleged prosecutorial misconduct, and that accomplice liability for murder by extreme indifference is a cognizable crime. Because I do not think the court should remand for a new trial, I would address the additional issues that the majority declines to reach. I would hold that Sandoval's sentence is proportionate to that of his codefendants and that he has failed to demonstrate ineffective appellate counsel.

- 1 -

included offense of manslaughter. This argument is based on a statutory right. *State v. Condon*, 182 Wn.2d 307, 316, 343 P.3d 357 (2015) (referring to RCW 10.61.006). For nonconstitutional arguments in a PRP, the petitioner must show that the error represents a "fundamental defect . . . that inherently resulted in a complete miscarriage of justice." *In re Pers. Restraint of Finstad*, 177 Wn.2d 501, 506, 301 P.3d 450 (2013). To determine if the trial court erred, we review the court's factual determinations for abuse of discretion and its legal conclusions de novo. *Condon*, 182 Wn.2d at 315-16.

The majority discusses the PRP standard of review, but decides the jury instruction issue based on *State v. Henderson*, 182 Wn.2d 734, 344 P.3d 1207 (2015), and its legal conclusion as though this case were on direct appeal. Majority at 7-10. A PRP is not a substitute for an appeal. *In re Pers. Restraint of Carter*, 172 Wn.2d 917, 922, 263 P.3d 1241 (2011). Rather, a PRP is "an extraordinary remedy." *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 540, 309 P.3d 498 (2013). Even if the trial court erred, we should not grant a new trial on this basis. The failure to include jury instructions on the lesser offense of manslaughter is not an *inherent* miscarriage of justice because the jury still could have come to the same conclusion even if presented with more options on their verdict form.[2]

---

[2] Sandoval's claim of ineffective assistance of appellate counsel is subject to the same flaw. He argues that his appellate counsel was ineffective for failing to raise issues that had merit. But

B.     Conspiracy to commit murder by extreme indifference is not cognizable

Sandoval's restraint for his count III conspiracy conviction is unlawful because it was "'imposed or entered in violation of the Constitution of the United States or the Constitution or laws of the State of Washington.'" *In re Pers. Restraint of Meirhofer*, 182 Wn.2d 632, 649 n.9, 343 P.3d 731 (2015) (quoting RAP 16.4(c)(2)). It is a violation of the Fourteenth Amendment to the United States Constitution to convict and incarcerate an individual for "conduct that [a state's] criminal statute . . . does not prohibit." *Fiore v. White*, 531 U.S. 225, 228, 121 S. Ct. 712, 148 L. Ed. 2d 629 (2001). Like other jurisdictions who have squarely addressed the issue,[3] I believe that one cannot conspire to commit murder by extreme indifference, a crime lacking the requisite specific intent for conspiracy.

---

even for claims with merit, he must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Sandoval fails to meet this standard. Furthermore, "[f]ailure to raise all possible nonfrivolous issues on appeal is not ineffective assistance." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 314, 868 P.2d 835 (1994).

[3] For example, in *State v. Borner*, 2013 ND 141, 836 N.W.2d 383, 390, the court held that conspiracy to commit depraved-mind murder "is not a cognizable offense." *See also State v. Baca*, 1997-NMSC-059, 124 N.M. 333, 950 P.2d 776, 787 (the crime of conspiracy to commit depraved-mind murder "did not exist"); *People v. Swain*, 12 Cal. 4th 593, 603, 909 P.2d 994, 49 Cal. Rptr. 2d 390 (1996) (conspiracy to commit "*implied malice* murder" is "*illogical*"); *Mitchell v. State*, 363 Md. 130, 149, 767 A.2d 844 (2001) (crime of depraved-mind murder is not consistent with the specific intent required for conspiracy); *People v. Hammond*, 187 Mich. App. 105, 466 N.W.2d 335, 337 (1991) (finding it logically inconsistent to plan to commit unpremeditated murder).

Admittedly, the United States Court of Appeals for the Fifth Circuit's reasoning in *United States v. Chagra* supports the majority's decision by rejecting the idea that "'one cannot plan an unplanned event.'" 807 F.2d 398, 401 (5th Cir. 1986); *see also United States v. Croft*, 124 F.3d 1109, 1123 (9th Cir. 1997) (agreeing with *Chagra*). But the defendant in *Chagra* was charged with conspiracy to commit second degree murder with "malice aforethought," defined as "an intent at

The crime of criminal conspiracy requires a conspirator to act "with intent that conduct constituting a crime be performed." RCW 9A.28.040(1). This means a conspirator must intend to commit *a particular crime. See State v. Bobic*, 140 Wn.2d 250, 265, 996 P.2d 610 (2000). But murder by extreme indifference does not require a specific intent to kill, or any specific intent for that matter. It simply requires an act of aggravated recklessness that results in a death.[4] *See* RCW 9A.32.030(1)(b); *State v. Dunbar*, 117 Wn.2d 587, 593, 817 P.2d 1360 (1991). A "'conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself.'" 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 12.2(c), at 277 (2d ed. 2003) (quoting *Developments in the Law: Criminal Conspiracy*, 72 HARV. L. REV 920, 939 (1959) (citing *Pettibone v. United States*, 148 U.S. 197, 204-05, 13 S. Ct. 542, 37 L. Ed. 419

---

the time of a killing . . . or an intent willfully to act in a callous and wanton disregard of the consequences of human life." 807 F.2d at 402 (emphasis omitted). Sandoval's conviction is not premised on any such forethought. The remaining cases the majority cites from other jurisdictions are distinguishable or unpersuasive. In *State v. Phillips*, 489 N.W.2d 613, 616 (S.D. 1992), the court acknowledged a guilty plea to conspiracy to commit second degree murder for someone other than the defendant and then proceeded to affirm the defendant's conviction for conspiracy to commit first degree murder. In *Commonwealth v. Fortune*, 305 Pa. Super. 441, 445-46, 451 A.2d 729 (1982), the court affirmed the defendant's conspiracy to commit second degree murder based on felony murder in which rape was the underlying felony. In *People v. La Plant*, 670 P.2d 802, 805 (Colo. App. 1983), the court specifically declined to consider the issue. Finally, the majority claims our decision in *State v. Beaver*, 148 Wn.2d 338, 60 P.3d 586 (2002), is similar to these cases. In *Beaver*, we never addressed whether the crime of conspiracy to commit second degree murder is cognizable; instead, we resolved the case on other grounds. *Id.* at 350.

[4] The crime required a depraved mind before 1975 and extreme indifference to human life after 1975. *State v. Anderson*, 94 Wn.2d 176, 188-91, 616 P.2d 612 (1980). Neither case requires an "'intent to cause . . . death.'" *Id.* at 191 (quoting RCW 9A.32.030(1)(a)).

(1893))); *Ingram v. United States*, 360 U.S. 672, 678, 79 S. Ct. 1314, 3 L. Ed. 2d 1503 (1959). "It follows, therefore, that there is no such thing as a conspiracy to commit a crime which is defined in terms of recklessly or negligently causing a result." LAFAVE, *supra*, at 278 (citing *Palmer v. People*, 964 P.2d 524 (Colo. 1998); *State v. Beccia*, 199 Conn. 1, 505 A.2d 683 (1986)). We have previously held that murder by extreme indifference "may not serve as a basis for the crime of attempt." *Dunbar*, 117 Wn.2d at 594-95. And attempt, like the crime of conspiracy, requires a specific intent to commit a particular crime. RCW 9A.32.030(1)(b); *Dunbar*, 117 Wn.2d at 590. For the same reasons that one cannot attempt to commit murder by extreme indifference, one cannot conspire to commit murder by extreme indifference.

In my view, Sandoval was convicted of a nonexistent crime, creating a facially invalid judgment and sentence. *In re Pers. Restraint of Hinton*, 152 Wn.2d 853, 857-58, 100 P.3d 801 (2004). On this basis, I would reverse his count III conviction and remand for resentencing.

Fairhurst, C.J.

Stephens, J.

No. 92412-1


GORDON McCLOUD, J. (concurring in part/dissenting in part)—I agree

with the majority that we must reverse petitioner Eduardo Sandoval's conviction on

count I, first degree murder (by extreme indifference) of Camilla Love. I also agree

with the majority that we must affirm Sandoval's conviction on count II, first degree

assault of Joshua Love. But I disagree with the majority's decision on count III,

conspiracy to commit murder (by extreme indifference). Instead, I agree with the

dissent that a conspiracy conviction based on a plan to commit the impossible-to-

plan crime of murder by extreme indifference must be reversed. I therefore concur

in part and dissent in part.


1

_____
Gordon McCloud, J.

Gonzáles, J.